# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

STATE OF KANSAS, ex rel., DEREK
SCHMIDT, ATTORNEY GENERAL,

       Plaintiff,

  v.

ELI LILLY AND COMPANY et al.,

       Defendants.

Case No. 23-cv-04002-EFM-RES

# MEMORANDUM IN SUPPORT OF MANUFACTURER DEFENDANTS'
# MOTION TO DISMISS THE COMPLAINT

# TABLE OF CONTENTS

PAGE

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 2

I.      The Distribution of, and Payment for, Branded Prescription Drugs .................................... 2

II.     The Rebate System Is Well-Known ................................................................................... 5

III.    This Lawsuit ..................................................................................................................... 6

ARGUMENT ....................................................................................................................... 7

I.      The State Fails to Plead a KCPA Claim ............................................................................ 7

        A.      The State Fails to Plead that Any Manufacturer's Conduct was Deceptive Under the KCPA ................................................................................................................ 8

        B.      The State Fails to Plead an Omissions Claim Under the KCPA ........................... 11

        C.      The State's Unconscionability Theory Also Fails ................................................. 13

        D.      The Complaint Challenges Conduct That Is Outside the Scope of the KCPA ..... 15

II.     The State Fails to Plead an Unjust Enrichment Claim ...................................................... 16

III.    The State Fails to Plead a Civil Conspiracy Claim ........................................................... 18

CONCLUSION .................................................................................................................... 20

# TABLE OF AUTHORITIES

PAGE

**Cases**

*Burton v. R.J. Reynolds Tobacco Co.*,
  884 F. Supp. 1515 (D. Kan. 1995) .............................................................. 8

*City of Miami v. Eli Lilly & Co.*,
  2022 WL 198028 (S.D. Fla. Jan. 21, 2022) ............................................. 18

*Eike v. Allergan, Inc.*,
  850 F.3d 315 (7th Cir. 2017) ....................................................................... 15

*Equitable Life Leasing Corp. v. Abbick*,
  757 P.2d 304 (Kan. 1988) ..................................................................... 15, 16

*Frost v. ADT, LLC*,
  947 F.3d 1261 (10th Cir. 2020) ................................................................. 11

*Gonzales v. Assoc. Fin. Serv. Co. of Kan., Inc.*,
  967 P.2d 312 (Kan. 1998) ........................................................................ 9, 15

*Hall v. Doering*,
  997 F. Supp. 1464 (D. Kan. 1998) ............................................................ 19

*Harris Cnty. v. Eli Lilly & Co.*,
  2022 WL 479943 (S.D. Tex. Feb. 16, 2022) ........................................... 16

*Haz-Mat Response, Inc. v. Certified Waste Servs. Ltd.*,
  910 P.2d 839 (Kan. 1996) ........................................................................... 16

*Heller v. Martin*,
  782 P.2d 1241 (Kan. Ct. App. 1989) ........................................................ 12

*In re Choc. Confectionary Antitrust Litig.*,
  602 F. Supp. 2d 538 (M.D. Pa. 2009) ...................................................... 15

*In re Graphics Processing United Antitrust Litig.*,
  527 F. Supp. 2d 1011 (N.D. Cal. 2007) ......................................... 14, 16, 19

*In re Motor Fuel Temperature Sales Practices Litig.*,
  867 F. Supp. 2d 1124 (D. Kan. 2012) ......................................................... 8

*In re Photochromic Lens Antitrust Litig.*,
  2011 WL 13141933 (M.D. Fla. Oct. 26, 2011) ...................................... 16

*In re Zetia (Ezetimibe) Antitrust Litig.*,
  2019 WL 1397228 (E.D. Va. Feb. 6, 2019) ............................................................ 16

*Jamieson v. Vatterott Educational Ctr., Inc.*,
  473 F. Supp. 2d 1153 (D. Kan. 2007) ............................................................... 10, 11

*Madkins v. T-Mobile Wireless Telephone Co.*,
  2018 WL 6031189 (D. Kan. Nov. 16, 2018) ......................................................... 19

*Mattos v. Eli Lilly & Co.*,
  2012 WL 1893551 (D. Kan. May 23, 2012) ........................................................... 11

*Nieberding v. Barrette Outdoor Living, Inc.*,
  2012 WL 6024972 (D. Kan. Dec. 4, 2012) ........................................................ 8, 13

*OMI Holdings, Inc. v. Howell*,
  918 P.2d 1274 (Kan. 1996) .................................................................................. 12

*Pharm. Care Mgmt. Ass'n v. District of Columbia*,
  522 F.3d 443 (D.C. Cir. 2008) .............................................................................. 6

*Reams v. City of Frontenac*,
  587 F. Supp. 3d 1082 (D. Kan. 2022) ............................................................. 18, 19

*Schoenbaum v. E.I. Dupont De Nemours & Co.*,
  517 F. Supp. 2d 1125 (E.D. Mo. 2007) ........................................................ passim

*Sec. Ben. Life Ins. Corp. v. Fleming Cos.*,
  908 P.2d 1315 (Kan. Ct. App. 1995) ................................................................... 18

*Spires v. Hosp. Corp. of Am.*,
  289 F. App'x 269 (10th Cir. 2008) ................................................................. 16, 17

*State ex rel. Stovall v. ConfiMed.com, L.L.C.*,
  38 P.3d 707 (Kan. 2002) ..................................................................................... 13

*Stoldt v. Toronto*,
  678 P.2d 153 (Kan. 1984) .................................................................................... 18

*Unruh v. Purina Mills, LLC*,
  221 P.3d 1130 (Kan. 2009) .................................................................................. 12

*Via Christi Reg'l Med. Ctr., Inc. v. Reed*,
  314 P.3d 852 (Kan. 2013) .................................................................................... 13

*Weckhorst v. Kansas State Univ.*,
  241 F. Supp. 3d 1154 (D. Kan. 2017) ............................................................. 10, 11

*Williamson v. Amrani*,
  152 P.3d 60 (Kan. 2007) ................................................................................ 12

*Winzler v. Toyota Motor Sales U.S.A., Inc.*,
  681 F.3d 1208 (10th Cir. 2012) ...................................................................... 6

*Wisconsin v. Abbott Labs.*,
  390 F. Supp. 2d 815 (W.D. Wis. 2005) .......................................................... 6

**Statutes**

42 U.S.C. § 1395w-3a(c)(6)(B) ................................................................... 3, 9

K.S.A. § 50-623 ................................................................................................. 7

K.S.A. § 50-626 ......................................................................................... passim

K.S.A. § 50-627 ............................................................................................ 7, 13

## INTRODUCTION

The State challenges conduct that is common practice throughout the pharmaceutical industry and that is expressly mandated by federal law.  The State's claims center on rebates that the drug manufacturer defendants Eli Lilly and Company, Novo Nordisk Inc., and Sanofi-Aventis U.S. LLC (collectively, the "Manufacturers") pay to entities known as pharmacy benefit managers (the "PBMs").  The State tries to portray rebates as underpinning a so-called insulin pricing "scheme."  But the complaint acknowledges that rebates are in fact a standard practice in the pharmaceutical industry.  As the complaint notes, PBMs serve as gatekeepers in the market for pharmaceutical medications, creating and maintaining lists of medications (called "formularies") that dictate the products to which insured patients have access.  PBMs require manufacturers to pay rebates in order to secure placement of medications like insulin on their formularies.  As the complaint makes clear, paying rebates is a standard practice in the pharmaceutical industry, and is not unique to insulin.  Despite drug rebating being well-known and ubiquitous for literally decades, the State claims that rebates somehow transform the Manufacturers' list prices for insulin into unlawful conduct, simply because those list prices don't reflect the Manufacturers' net prices (after accounting for rebates).

The State's claims suffer from several fatal defects.  The claim under the Kansas Consumer Protection Act ("KCPA") rests on the notion that the Manufacturers' list prices are fraudulently and unconscionably "inflated" because they do not reflect the rebates that the Manufacturers pay to PBMs.  But the complaint fails to identify even a *single* instance in which any Manufacturer represented that its list prices *do* reflect rebates, much less identify the purportedly deceptive acts with the particularity required by Rule 9(b).  Nor does the complaint attempt to explain how pricing insulin in compliance with federal law—which requires the

Manufacturers' list prices to *exclude* rebates and other discounts—could possibly have deceived the State or its citizens.  The State's attempt to allege that the Manufacturers' list prices are unconscionable similarly fails because allegations that prices are too high—without allegations of deception—are not actionable under the KCPA.  Moreover, the complaint lacks any allegation that the Manufacturers wielded unequal bargaining power, or indeed had any interactions at all with either the State or any Kansas citizen.  And to the extent that the State's allegations boils down to the idea that the Manufacturers engaged in anticompetitive price-fixing, such allegations are not cognizable under the KCPA.

The State's unjust enrichment and civil conspiracy claims should also be dismissed for independent reasons.  The unjust enrichment claim fails because the complaint nowhere alleges that the Manufacturers received a benefit from the State or any Kansas consumer, or that the Manufacturers retained such a benefit "unjustly."  And because the State fails to plausibly allege that the Manufacturers entered an agreement to violate the law, its civil conspiracy claim likewise fails.  The claims against the Manufacturers should thus be dismissed in their entirety.[1]

## BACKGROUND

## I.      The Distribution of, and Payment for, Branded Prescription Drugs

The Manufacturers are pharmaceutical companies that research, develop, manufacture, and sell prescription drugs, including insulin.  Compl. ¶¶ 5, 43, 56, 69.  Through their research and development efforts, the Manufacturers have made many improvements to insulin and related diabetes medications that have improved not only patient safety, but also the efficacy, speed, and flexibility of treatment options for people with diabetes.  *Id*. ¶¶ 209-216, 233-35.

---

[1] The Manufacturer Defendants also join in and adopt by reference the arguments raised in the PBM Defendants' Rule 12(b)(6) Motion to Dismiss the Complaint for Failure to State a Claim Upon Which Relief Can Be Granted.

Because of these efforts, "insulin today is generally safer and more convenient to use." *Id.* ¶ 220.

The Manufacturers do not sell insulin directly to patients, insurers, or health plans. Their medications only reach patients "in one of two ways: (1) from manufacturer to wholesaler, wholesaler to pharmacy, and pharmacy to patient; or (2) from manufacturer to mail-order pharmacy, and mail-order pharmacy to patient." *Id.* ¶ 257 & Fig. 12. Each purchaser in the distribution chain pays "different prices set by different entities for the same drugs." *Id.* ¶ 258.

The only price that the Manufacturers set or publish is the Wholesale Acquisition Cost ("WAC"), which is the price that drug wholesalers pay to acquire the products from Manufacturers. *Id.* ¶ 260. The meaning of WAC is set by federal law: it is "the manufacturer's list price for the drug or biological to wholesalers or direct purchasers in the United States, ***not including prompt pay or other discounts, rebates, or reductions in price***." 42 U.S.C. § 1395w-3a(c)(6)(B) (emphasis added).

Despite claiming that there "is no transparency in this pricing system" for branded prescription drugs, the State admits that the Manufacturers publicly report their WACs to "publishing compendiums . . . who then publish that price." *Id.* ¶¶ 259-60. Indeed, the complaint includes charts detailing the prices of the Manufacturers' insulins going back over a decade. *See, e.g.*, *id.* Figs. 1-11. The State thus knows the WAC of every diabetes medication sold by the Manufacturers, including the insulins at issue here. *Id.* Figs. 2-10. Nor does the State allege that these prices reflect anything other than the true WAC as defined by federal law.

While the Manufacturers are responsible for setting only one price (WAC), the prices charged by downstream actors—and ultimately paid by consumers—differ. *Id.* ¶¶ 257-58. The price that a wholesaler charges a pharmacy for a drug differs from the WAC price that the

wholesaler paid to the manufacturer for that drug.  As the complaint illustrates, pharmacies then sell medications to consumers at prices that differ from what they pay to wholesalers, and that are impacted by the terms of a given consumer's health insurance plan (if any).  *Id.* Fig. 12.

Although the PBMs are not involved with the physical distribution of pharmaceutical drugs, they are at the center of the pharmaceutical payment chain and thus are the only entities with complete information about what each actor in the chain is paying.  *Id.* ¶¶ 268, 276-77.  As relevant here, the PBMs work with health plans to manage pharmacy benefits—including prescription drug coverage—for plan members.  *Id.* ¶ 269.  In doing so, the PBMs "establish standard formulary offerings"—and if a "drug is not included on a formulary, then it is not covered by health insurance."  *Id.* ¶ 7.  This "asymmetry of information," along with the PBMs' control over formularies, gives the PBMs "a crucial point of leverage in the system."  *Id.* ¶¶ 311-12.

The complaint makes clear that the Manufacturers must fiercely compete for formulary access.  *Id.* ¶ 336-39.  If a Manufacturer's drug is excluded from a formulary, patients lose access to the drug.  *Id.* ¶¶ 7-10, 314, 336-37, 339.  Conversely, being included on a formulary means that a drug receives insurance coverage, thus making it cheaper and more accessible to consumers.  *Id.*  As a result, the Manufacturers "must obtain preferable formulary position" if they "want their drugs to be prescribed and paid for."  *Id.* ¶¶ 10, 321.  Given that the PBM Defendants "control[] more than 80% of the market and manag[e] pharmacy benefits for more than 270 million Americans," *id.* ¶ 286, it is no surprise that the Manufacturers compete by offering large rebates to PBMs to try to obtain favorable formulary placement.  *Id.* ¶¶ 10, 321.

## II.     The Rebate System Is Well-Known

The State's allegations show that the drug pricing practices at issue in this case are both standard in the pharmaceutical industry and well-known.  Indeed, the State admits that the Manufacturers and PBMs have openly disclosed the payment of rebates for years.  For example, as the complaint notes, representatives from each Manufacturer discussed the "significant demand for rebates" from PBMs at a congressional hearing nearly four years ago.  *Id*. ¶ 336.  As a representative for Eli Lilly testified, "[s]eventy-five percent of [the reported] price is paid for rebates and discounts to secure [formulary position]."  *Id.* ¶ 337.  Failure to provide these rebates would result in severe consequences—the PBMs would stop including a Manufacturer's drugs on their formularies, which would result in "billions of dollars" in losses for that Manufacturer.  *Id.* ¶¶ 313, 336-38.

Moreover, going back over a decade, the Manufacturers have consistently disclosed in public SEC filings that they must pay significant rebates to maintain favorable formulary position.  *See* Eli Lilly & Co., 2009 Annual Report (Form 10-K) at 3, 26 (Feb. 22, 2010) (Ex. 1),[2] *available at* https://tinyurl.com/5n6v4rke (explaining that in "response to competitive pressures, [it] entered into arrangements with [purchasers] which provide for discounts or rebates on one or more Lilly products"); Novo Nordisk, 2013 Annual Report (Form 6-K) at 64 (Feb. 5, 2014) (Ex. 2), *available at* https://tinyurl.com/5256uvw9 (disclosing that it paid over 32 billion Danish Krone (i.e., over $5 billion at then-current exchange rates) in rebates and other discounts to obtain formulary status); Sanofi, 2014 Annual Report (Form 20-F) at 105 (Mar. 10, 2015) (Ex. 3), *available at* https://tinyurl.com/m4udvmbb; ("To maintain [favorable formulary] positions,

---

[2] References to "Ex." are exhibits to the Affidavit of Andrew Yaphe filed concurrently as Exhibit A.

we had to significantly increase the level of discounts offered in order to match the substantial rebates offered by our competitors.").[3]  Courts have similarly discussed the role PBMs play in negotiating rebates for pharmaceutical drugs in published opinions going back decades.  *See, e.g.*, *Pharm. Care Mgmt. Ass'n v. District of Columbia*, 522 F.3d 443, 445 (D.C. Cir. 2008) ("[P]harmacy benefit manager[s] . . . pool health benefit providers and negotiate discounts on pharmaceuticals from manufacturers or pharmacies."); *Wisconsin v. Abbott Labs.*, 390 F. Supp. 2d 815, 818 (W.D. Wis. 2005) (noting allegations that PBMs "obtain benefits for themselves in the form of fees and rebates paid by manufacturers").

### III.    This Lawsuit

The Kansas Attorney General, suing on behalf of the State and Kansans with diabetes, ignores these years of disclosures and claims that this well-known and federally sanctioned system of price reporting constitutes a deceptive price-fixing scheme.  The complaint centers on an alleged "Insulin Pricing Scheme" between the Manufacturers and PBMs that purportedly increased prices for Kansans with diabetes through the payment of supposedly "secret" rebates. Compl. ¶¶ 19-24, 307-29.  Stripped of nefarious labels, however, the State's allegations boil down to the idea that PBMs have used their "dominant market share" to require the Manufacturers to pay "larger and larger" rebates for formulary access—i.e., that the Manufacturers paid discounts to make their medications available to patients—and that, to sustain the need for increasing discounts, the Manufacturers "raise[d] list prices" while "largely maintaining their net prices."  *Id.* ¶¶ 313, 317, 337.

---

[3] The Court can take judicial notice of these public filings for purposes of ruling on this motion.  *See Winzler v. Toyota Motor Sales U.S.A., Inc.*, 681 F.3d 1208, 1212-13 (10th Cir. 2012) ("[t]he contents of an administrative agency's publicly available files" will "traditionally qualify for judicial notice").

Despite conceding that the payment of PBM rebates is ubiquitous and a result of publicly known market factors, the State insists that those rebates are fraudulent. According to the State, because the Manufacturers' WAC prices do not reflect the rebates paid to PBMs—and notwithstanding that federal law *requires* WAC prices not to reflect rebates—the published WAC price is "so untethered from the net prices . . . as to constitute a false price." *Id.* ¶¶ 21, 323. Tellingly, the State does not allege that *any* Manufacturer made *any* misrepresentation about the relationship between the WAC price and its profit from the sale of any of the at-issue drugs. Nor could it. In fact, the State admits that each Manufacturer has openly disclosed that its net prices are less than the prices it charges wholesalers because the Manufacturers must pay steep rebates. *Id.* ¶¶ 336-38. Nor does the State explain how its theory of fraud—i.e., that list prices *must* include PBM rebates—can be reconciled with federal law requiring the opposite. Ignoring this contradiction, the State alleges that the Manufacturers acted with the "intent that the diabetics and payors rely" on the purportedly inflated WACs "in purchasing the at-issue drugs." *Id.* ¶ 461.

The State asserts three causes of action based on this theory of deceit: (1) a claim that the Manufacturers violated the KCPA; (2) an unjust enrichment claim; and (3) a civil conspiracy claim. *Id.* ¶¶ 456-87.

## ARGUMENT

## I.    The State Fails to Plead a KCPA Claim

The State's KCPA claim—whether premised on alleged deceptive acts, omissions, unconscionable conduct, or price-fixing—fails as a matter of law. The KCPA is a consumer protection statute that prohibits certain "deceptive and unconscionable practices" in connection with a consumer transaction. K.S.A. §§ 50-623, 626-27. A claim under the KCPA requires a

showing that the defendants committed a deceptive or unconscionable act or practice that aggrieved the plaintiff. *See In re Motor Fuel Temperature Sales Practices Litig.*, 867 F. Supp. 2d 1124, 1138, 1141 (D. Kan. 2012). Because the complaint fails to identify any allegedly deceptive or unconscionable acts, let alone with the specificity required by Rule 9(b), and challenges conduct that falls outside the ambit of the statute, the KCPA claim should be dismissed.

### A.   The State Fails to Plead that Any Manufacturer's Conduct was Deceptive Under the KCPA

To start, the State's KCPA deception theory fails because the complaint does not adequately allege any deceptive conduct, let alone with the particularity that Rule 9(b) requires. To state a claim for deception under the KCPA, the State must plead factual allegations that show that publishing the challenged WAC prices constituted misrepresentations, "oral and written representations of exaggeration, falsehood, innuendo and ambiguity," or "false or misleading representations." *Id.* ¶ 461 (citing K.S.A. § 50-626(b)(1)(A), (F), (b)(7), (b)(10)). "In accordance with Federal Rule of Civil Procedure 9(b), [the State] must plead with particularity allegations of deceptive or unconscionable acts or practices under the KCPA." *Nieberding v. Barrette Outdoor Living, Inc.*, 2012 WL 6024972, at *2 (D. Kan. Dec. 4, 2012); *Burton v. R.J. Reynolds Tobacco Co.*, 884 F. Supp. 1515, 1524 (D. Kan. 1995) ("[T]he policy reasons for requiring fraud actions to be pled with particularity . . . apply equally to actions brought under the KCPA."). The complaint does not come close to satisfying that exacting standard.

The complaint alleges that the Manufacturers engaged in a "deceptive practice" by publishing allegedly "inflated" list prices for their drugs that did not include the rebates that the Manufacturers pay to PBMs. *See* Compl. ¶¶ 21, 323. The State's theory of deception fails

because the complaint is devoid of any allegation that any Manufacturer ever implied—much less "represented"—that the list prices they report (and charge to wholesalers) were the net prices that the Manufacturers receive after accounting for rebates.  This should come as no surprise given that, as noted above, federal law requires manufacturers to report list prices that do "not includ[e] prompt pay or other discounts, *rebates* or reductions in price."  *See* 42 U.S.C. § 1395w-3a(c)(6)(B) (emphasis added).  That explains why the State cannot identify a single instance in which any Manufacturer represented that its insulin list prices *violated* federal law by reflecting PBM rebates.  Because the complaint fails to identify any misrepresentation, falsehood, or misleading statement made by any Manufacturer regarding their published list prices, the State's KCPA deception claim fails.  *See Schoenbaum v. E.I. Dupont De Nemours & Co.*, 517 F. Supp. 2d 1125, 1152 (E.D. Mo. 2007), *vacated in part on other grounds*, 2007 WL 3331291 (dismissing KCPA deception claim where plaintiff failed to "allege[] that Defendants made any oral or written misrepresentation with respect to the pricing of the [products] at issue"); *cf. Gonzales v. Assoc. Fin. Serv. Co. of Kan., Inc.*, 967 P.2d 312, 328 (Kan. 1998).

The State's claim also fails because it is not pled with the specificity required by Federal Rule of Civil Procedure 9(b).  Rather than identify any particular supposedly deceptive acts, specify when they occurred, and allege which defendant engaged in them, the complaint generally alleges that the Manufacturers collectively "reported and published artificially inflated prices for each at-issue drug" and "made false statements related to the reason (research and developments costs) behind their artificially inflated prices."  *Id.* ¶ 461 (alleging violation of K.S.A. §§ 50-626(b)(1)).  But the complaint fails to identify *any* specific statement it alleges is false, let alone *which* defendant allegedly made it.  The State's allegation that "Defendants [collectively] misrepresented that the [unspecified] Manufacturer Payments exchanged between

them lowered the actual price of the at-issue drugs" (*id.*) is likewise unavailing, as such vague allegations and group pleadings are insufficient.  *See Jamieson v. Vatterott Educational Ctr., Inc.*, 473 F. Supp. 2d 1153, 1157 (D. Kan. 2007) (general allegations regarding misrepresentations made by defendants' agents and employees do not satisfy Rule 9(b)); *Weckhorst v. Kansas State Univ.*, 241 F. Supp. 3d 1154, 1177 (D. Kan. 2017) (dismissing KCPA claim where "[p]laintiff identifie[d] KSU as the entity responsible for making the representations, but [did] not specify the employees or agents of the university who actually made the verbal and written representations").  The fact that the complaint lacks even a single allegation of *any* interaction between the Manufacturers (on the one hand) and either the State or individual Kansans with diabetes (on the other), let alone any allegation that any Manufacturer "made any oral or written misrepresentation with respect to the pricing of the [products] at issue," is fatal to the State's KCPA claim.  *See Schoenbaum*, 517 F. Supp. 2d at 1152 (dismissing KCPA claim alleging that the defendants "used pricing sheets . . . to give the impression that they were selling [the accused products] at competitive prices, when in fact they were selling [them] at artificially high and supracompetitive prices" where complaint did not allege any specific misrepresentation).

Nor can the State rely on the notion that the Manufacturers' list prices themselves somehow constitute deceptive representations.  The complaint does not identify which prices, on what dates, and in which publications were "artificially inflated," nor does it point to any specific oral or written misrepresentations about what those prices represent by *any* Manufacturer.  Compl. ¶ 461 (alleging deceptive acts under K.S.A. §§ 50-626(b)(1), (2), (3) (7)); *see also Jamieson*, 473 F. Supp. 2d at 1157-58 (allegations that "written misrepresentations" were "delivered through the mail" were insufficient under Rule 9(b)); *M.F. v. ADT, Inc.*, 357 F. Supp.

3d 1116, 1137 (D. Kan. 2018), *aff'd sub nom. Frost v. ADT, LLC*, 947 F.3d 1261 (10th Cir.

2020) (allegation that misrepresentation was on defendant's website "up to the date of filing of

this complaint" was insufficient under Rule 9(b)).  And while the complaint includes vague

allusions to the Manufacturers purportedly misleading the public through unspecified

"promotional and marketing materials" (Compl. ¶ 394), the complaint lacks allegations regarding

*any* specific statement made by *any* Manufacturer via such "materials"—much less

particularized allegations indicating that any such statement was in fact misleading, related to

pricing, or ever seen by the State or any of its citizens.  Rather, the complaint makes clear that

the Manufacturers do not interact with the State or Kansans with diabetes at all.  *See* Compl. ¶

257 & Fig. 12; *Mattos v. Eli Lilly & Co.*, 2012 WL 1893551, at *7 (D. Kan. May 23, 2012)

("general references to marketing brochures and other materials" did not satisfy Rule 9(b)).

The complaint's failure to identify any specific deceptive act, or to provide any factual

allegations supporting the State's claims of deceptive conduct, dooms the State's KCPA claim.

*See ADT, Inc.*, 357 F. Supp. 3d at 1137 (dismissing inadequately pled KCPA deceptive act claim

for failure to comply with Rule 9(b)); *Weckhorst*, 241 F. Supp. 3d at 1176, (same); *Jamieson*,

473 F. Supp. 2d at 1157 (same).  Because the State has failed to meet the heightened pleading

requirements of Rule 9(b), the Court should dismiss the KCPA claim in its entirety.

### B.      The State Fails to Plead an Omissions Claim Under the KCPA

At certain points, the complaint appears to suggest that the Manufacturers' list prices

were deceptive because the Manufacturers failed to disclose that their insulin list prices did not

include rebates.  Compl. ¶ 461 (citing K.S.A. 50-626(b)(3)).  But any attempt to anchor the

State's claims in an omission theory fails as a matter of law.  "Under [section] 50–626(b)(3) of

the KCPA, an allegation of deception by failing to fully disclose material facts requires proof of

the willful failure to state a material fact or the willful concealment, suppression, or omission of

11

a material fact." *Williamson v. Amrani*, 152 P.3d 60, 73 (Kan. 2007), *superseded by statute on different grounds as recognized in Kelly v. VinZant*, 197 P.3d 803 (Kan. 2008).  The State's claims fail at the threshold because "[b]efore one can willfully fail to disclose a fact, there must be an obligation to communicate the fact.  In other words, there must be a duty to disclose the fact." *Id.*

Here, the State fails to show that any Manufacturer owed the State or any Kansas consumer a duty to disclose, as required under Kansas law.  *See id.*  Under the KCPA, a supplier has a duty to disclose a material fact only if (a) it knows that the consumer is entering into a transaction under a mistake about the material fact, and (b) the consumer would reasonably expect the disclosure of that material fact based on the relationship between the consumer and the supplier or other objective circumstances.  *See OMI Holdings, Inc. v. Howell*, 918 P.2d 1274, 1300-01 (Kan. 1996).  The State does not and cannot identify any such duty here.  In fact, the complaint makes clear that the Manufacturers have *no* relationship with the State or any Kansas consumers: they deal with PBMs, wholesalers, and pharmacies.  *See* Compl. ¶¶ 257, 268-69; *id.* at 62 fig. 12.

The State's omission theory under the KCPA also fails for the independent reason that the complaint does not allege that any purported omission was willful.  The law is clear that the KCPA "does not proscribe mere nondisclosure of a material fact." *Heller v. Martin*, 782 P.2d 1241, 1244 (Kan. Ct. App. 1989).  Instead, the statute prohibits the *willful* omission of material facts, wherein "willful" means "an intent to harm the consumer." *Unruh v. Purina Mills*, *LLC*, 221 P.3d 1130, 1139 (Kan. 2009).  The complaint includes no such allegations.  Nor could it:  As noted above, the Manufacturers have for many years *publicly* disclosed the very facts that the State alleges were concealed—namely, that the Manufacturers' list prices are offset by rebates

needed to secure placement on the PBMs' formularies—both in public filings and before

Congress.  *See supra*, Background section II.  As such, insofar as the KCPA claim is grounded in

omissions, it is also subject to dismissal.

### C.      The State's Unconscionability Theory Also Fails

The State's unconscionability theory under the KCPA fails for similar reasons.  The

determination of unconscionability under the KCPA is a question of law.  *See Via Christi Reg'l*

*Med. Ctr., Inc. v. Reed*, 314 P.3d 852, 867 (Kan. 2013).

The State alleges that the Manufacturers violated four separate subsections of the KCPA

because they sold the "at-issue drugs at [ ] egregiously inflated prices" that do not account for

PBM rebates.  *See, e.g.*, Compl. ¶¶ 431-33, 465.  But all their allegations suffer from the same

fatal infirmity: the absence of any allegation of deceptive conduct.  *Id.* ¶ 465 (citing K.S.A. § 50-

627(b)(1), (2), (5), (6)).  Under the KCPA, an unconscionable act requires *both* the presence of

unequal bargaining power *and* deceptive conduct.  *Via Christi*, 314 P.3d at 867; *see also State ex*

*rel. Stovall v. ConfiMed.com, L.L.C.*, 38 P.3d 707, 713 (Kan. 2002) ("[T]here must be some

element of deceptive bargaining conduct present as well as unequal bargaining power to render

the contract between the parties unconscionable.").  The complaint alleges neither.

First, as explained above, the complaint is devoid of *any* allegation of *any* particular

deceptive act by *any* Manufacturer, let alone with the specificity required by Rule 9(b).  That

dooms the State's KCPA unconscionability claim just like it dooms the KCPA deception claim.

*See Via Christi*, 314 P.3d at 867 (unconscionability claim requires deceptive conduct);

*ConfiMed.com*, 38 P.3d at 713 (same); *see also Nieberding*, 2012 WL 6024972, at *2 (noting

that the requirements of Rule 9(b) apply equally to allegations of deception and

unconscionability under the KCPA).

Second, the complaint also fails to allege that the Manufacturers exerted unequal bargaining power.  Indeed, the complaint makes plain that neither the State nor its citizens have *any* direct interactions with the Manufacturers, and are not involved in *any* negotiations with the Manufacturers related to the pricing of insulin.  Rather, as the complaint lays out, the Manufacturers sell their diabetes medications to nonparty wholesalers, who sell those medications to pharmacies, from which the State and its citizens buy them.  Compl. ¶¶ 256-58.[4] And the Manufacturers, in turn, negotiate rebates not with the State or its citizens, but with PBMs.  *Id.* ¶ 276.  Indeed, to the extent that the complaint includes any allegations of one-sided negotiations or disproportionate bargaining power, they pertain to the *Manufacturers'* lack of leverage compared to the PBMs.  *See, e.g.*, *id.* ¶¶ 9-11, 289, 312-14 (explaining that the PBMs' control of drug formularies and "dominant market share" allow them to threaten Manufacturers with "billions of dollars in profit loss" if adequate rebates are not provided).  The State has thus alleged *no* facts showing that the Manufacturers possessed the type of unequal bargaining power required for an unconscionability claim under the KCPA.

At bottom, the complaint contains little more than generalized grievances about the market and prices for insulin.  Under settled law, that is not a valid basis for a KCPA claim, because "pleading unconscionability [under the KCPA] requires something more than merely alleging that the price of a product was unfairly high."  *In re Graphics Processing United Antitrust Litig.,* 527 F. Supp. 2d 1011, 1029-30 (N.D. Cal. 2007); *see also Schoenbaum*, 517 F. Supp. 2d at 1153 (rejecting unconscionability claim based on failure to disclose supracompetitive prices).  "Transactions that merely appear unfair . . . do not state a claim under the KCPA."

---

[4] The complaint also alleges that in certain situations the Manufacturers may sell their products directly to mail-order pharmacies in lieu of wholesalers.  *Id.*

*Gonzales*, 967 P.2d at 328; *see also Eike v. Allergan, Inc.*, 850 F.3d 315, 318 (7th Cir. 2017) ("The fact that a seller does not sell the product that you want, or at the price you'd like to pay, is not an actionable injury.").  But stripped of its conclusory allegations and rhetoric, that is all the complaint alleges.  *See, e.g.*, Compl. ¶ 398 (complaining that "the Manufacturer Defendants published prices in Kansas of $300-$400 for the same at-issue drugs they could have priced at less than $2 and still been profitable"); *see also id.* ¶¶ 21, 401, 436.

### D.    The Complaint Challenges Conduct That Is Outside the Scope of the KCPA

Although the complaint purports to accuse the Manufacturers of engaging in "deceptive" and "unconscionable" acts, Compl. ¶ 461, elsewhere it appears to also try suggesting that the Manufacturers engaged in a form of anticompetitive price-fixing.  For example, while the complaint fails to provide any specifics or supporting allegations, it nevertheless references "collusive price increases," *id*. ¶¶ 254-55, "lockstep movements in price," *id.* ¶¶ 248-53, the "monopoly power" and "near complete control over the Manufacturer Payment market" of the PBM Defendants, *id.* ¶¶ 287-89, and "artificially inflated list prices," *id.* ¶ 317.

To the extent that the complaint attempts to suggest that the Manufacturers engaged in anticompetitive price-fixing conduct, that attempt fails.  For one thing, the complaint lacks plausible factual allegations supporting such a claim.  But even including such allegations would make no difference, because courts have consistently held that allegations of anticompetitive conduct—including allegations of "artificially inflated prices"—fall outside the "consumer harms redressable" under the KCPA.  *In re Choc. Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 584 (M.D. Pa. 2009) (citing *Equitable Life Leasing Corp. v. Abbick*, 757 P.2d 304, 306–08 (Kan. 1988)); *id.* (the KCPA is "inapplicable to price-fixing claims"); *Schoenbaum*, 517 F. Supp. 2d at 1152-53 ("[A]cts relating to agreements, monopolies, trusts, conspiracies or combinations

in restraint of trade, do not fall within the practices prohibited by the KCPA.") (citing *Abbick*, 757 P.2d 304 at 307); *In re Graphics*, 527 F. Supp. 2d at 1029-30 ("allegations of price fixing . . . are not the kind of conduct prohibited under" the KCPA); *In re Photochromic Lens Antitrust Litig.*, 2011 WL 13141933, at *7 (M.D. Fla. Oct. 26, 2011) ("[A]nticompetitive conduct is not actionable under [the KCPA].") (citing *Abbick*, 757 P.2d at 306–08; *In re Zetia (Ezetimibe) Antitrust Litig.*, 2019 WL 1397228, at *31 (E.D. Va. Feb. 6, 2019) (same); *Schoenbaum*, 517 F. Supp. 2d at 1152-53; *see also Harris Cnty. v. Eli Lilly & Co.*, 2022 WL 479943, at *12-13 (S.D. Tex. Feb. 16, 2022) (dismissing similar claims alleging an identical "insulin pricing scheme" against the same Manufacturers where allegations of consumer protection statute violations were essentially "prohibited antitrust claims" that were "masquerad[ing] as consumer protection claims").  Any attempt at pleading a price-fixing claim thus fails out of the gates.

## II.    The State Fails to Plead an Unjust Enrichment Claim[5]

The State's unjust enrichment claim also fails.  Such a claim requires that "(1) plaintiff conferred a benefit on defendant; (2) defendant knew and received a benefit; and (3) defendant retained the benefit under circumstances that make it unjust."  *Spires v. Hosp. Corp. of Am.*, 289 F. App'x 269, 273 (10th Cir. 2008) (citing *Haz-Mat Response, Inc. v. Certified Waste Servs. Ltd.*, 910 P.2d 839, 847 (Kan. 1996)).  The State's claim fails because the complaint does not adequately allege either that any Manufacturer received any benefit from the State or Kansas

---

[5] The PBM Defendants' Rule 12(b)(6) Motion, which (as noted above, *supra* n.1) the Manufacturers fully join in, further explains why the unjust enrichment claim should be dismissed.

citizens, or that any such benefit (assuming *arguendo* that any benefit was conferred) was "unjust."

To state a claim for unjust enrichment, the State must plausibly allege that the Manufacturers received a benefit from the State or from Kansas citizens. But the complaint affirmatively refutes that idea. As the complaint notes, neither the State nor Kansas citizens have *any* relationship with the Manufacturers. *See* Compl. ¶¶ 263, 269-73, 350, 377, 383, 430, 435. Instead, the Manufacturers sell their medications to wholesalers, not end consumers, and the State and its citizens "pay different prices set by different entities" to purchase the at-issue drugs from third parties. *Id.* ¶¶ 257-58. And even setting all of that aside, and even assuming the alleged scheme exists (which it does not), the complaint itself makes clear that it has not *benefitted* the Manufacturers. To the contrary, the "Manufacturers have . . . largely maintain[ed] their net prices" as a result of "paying larger and larger amounts of Manufacturer Payments back to the PBMs." *Id.* ¶ 317. That is because of the immense leverage that the PBMs wield, which means that "if Manufacturers want their drugs to be prescribed and paid for, they must obtain preferable formulary position." *Id.* ¶ 10; *see also id.* ¶ 313. After all, failure to secure placement of a "drug on one of [the PBMs'] standard formulary offerings" means that "it is not available to 80% of Kansas'[] citizens." *Id.* ¶ 9; *see also id.* ¶¶ 286-87.

The Manufacturers have thus had to pay increasing rebates simply to maintain the status quo and ensure that their life-saving medications will be available to the majority of Kansas' citizens. Because the complaint does not identify any benefit that the Manufacturers have received from either the State or its citizens as a result of the alleged scheme, the unjust enrichment claim should be dismissed. *See Spires*, 289 F. App'x at 273 (affirming dismissal of unjust enrichment claim where plaintiffs failed to identify any benefit actually conferred on

defendant); *see also City of Miami v. Eli Lilly & Co.*, 2022 WL 198028, at *9-10 (S.D. Fla. Jan. 21, 2022) (dismissing unjust enrichment claim under Florida law predicated on similar allegations against the same Manufacturers).

The State's unjust enrichment claim fails for another, independent reason: The State fails to plead that the Manufacturers engaged in any wrongful or unconscionable conduct. A defendant must have "wrongfully secured" the benefit or "passively received one which it would be unconscionable for him to retain." *See Sec. Ben. Life Ins. Corp. v. Fleming Cos.*, 908 P.2d 1315, 1323 (Kan. Ct. App. 1995). But the State's unjust enrichment claim—which is "based on the larger unconscionable and deceptive Scheme that drove up the at-issue artificially inflated list prices for all Kansas diabetics," Compl. ¶ 480—is a carbon copy of its deficient KCPA allegations. Because the State's KCPA claim fails for the reasons set forth above, the State has also failed to allege any wrongful or unconscionable conduct by the Manufacturers, similarly foreclosing its unjust enrichment claim.

## III.    The State Fails to Plead a Civil Conspiracy Claim

Finally, the State's civil conspiracy claim also fails. The state fails to plead two necessary elements: (1) an underlying wrong independent of the conspiracy and (2) an agreement or meeting of the minds by Defendants to commit the wrong.

To plead a civil conspiracy claim, the State must plead an "underlying tort *independent* of the conspiracy." *Reams v. City of Frontenac*, 587 F. Supp. 3d 1082, 1104 (D. Kan. 2022) (citing *Stoldt v. Toronto*, 678 P.2d 153, 161 (Kan. 1984)) (emphasis added). For all the reasons above, the State fails to show that the Manufacturers' conduct is unlawful. And because the State's civil conspiracy allegations largely parrot the KCPA and unjust enrichment claims, the State's conspiracy claim is likewise insufficiently pleaded. *Hall v. Doering*, 997 F. Supp. 1464, 1473

(D. Kan. 1998) ("Where claims for the underlying wrong (giving rise to a cause of action independent of the conspiracy) are dismissed, the civil conspiracy claim must fail as a matter of law.").

Nor does the State adequately allege the necessary agreement.  A civil conspiracy claim requires a plaintiff to allege "a meeting of the minds in the object or course of action."  *Reams*, 587 F. Supp. 3d at 1104.  The State's vague and conclusory allegations of "coordinated efforts" (which amount to nothing more than assertions that the Manufacturers each "routinely communicate" with PBM Defendants and each meet with PBM Defendants at industry conferences) and "lockstep price increases" (which are nothing more than claims that certain unspecified price increases took place "days" or "only a few weeks" after an industry conference, Compl. ¶¶ 290-306, without any factual allegations suggesting that any collusive behavior actually took place at the conference) are inadequate to support a civil conspiracy claim.  S*ee Madkins v. T-Mobile Wireless Telephone Co.*, 2018 WL 6031189, at *8 (D. Kan. Nov. 16, 2018) (explaining that "conclusory allegations of conspiracy are insufficient" under Kansas law and dismissing conspiracy claim because the plaintiff had "not come forward with specific facts showing the requisite elements of a civil conspiracy").  Moreover, the fact that the Manufacturer and PBM Defendants interact at trade meetings within their shared industry is neither surprising nor unexpected.  Indeed, the State admits that the pharmaceutical industry's "unique" structure necessarily involves interaction between the PBMs and Manufacturers. Compl. ¶¶ 268-69, 272-76, 307; *see also In re Graphics*, 527 F. Supp. 2d at 1011, 1014, 1021, 1023-24 (dismissing extensive allegations of "secret meetings and communications," "[a]ttendance at trade shows and conferences" that were "sponsored" by defendants, and "parallel pricing" as inadequate to "show a plausible entitlement to relief").  Similarly, the State

fails to connect its general allegations regarding the "insular nature of the pharmaceutical industry," Compl. ¶¶ 290-306, to any specific allegations that Defendants agreed to engage in a purported "Insulin Pricing Scheme."  In light of these deficiencies, the State's civil conspiracy claim fails.

## CONCLUSION

For the foregoing reasons, the Manufacturers respectfully request that the Court dismiss all claims against them with prejudice.

Respectfully Submitted,

FOULSTON SIEFKIN, L.L.P.


*/s/ Gary L. Ayers*

Gary L. Ayers, #10345
Clayton J. Kaiser, #24066
gayers@foulston.com
ckaiser@foulston.com
1551 N. Waterfront Parkway, Suite 100
Wichita, Kansas 67206-4466
Phone: (316) 291-9708
Fax: (866) 347-5133 9225

James P. Rouhandeh (*pro hac vice*)
rouhandeh@davispolk.com
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Phone: (212) 450-4000
Fax: (212) 701-5800

Neal A. Potischman (*pro hac vice*)
Andrew D. Yaphe (*pro hac vice*)
neal.potischman@davispolk.com
andrew.yaphe@davispolk.com
DAVIS POLK & WARDWELL LLP
1600 El Camino Real
Menlo Park, California 94025
Phone: (650) 752-2000
Fax: (650) 752-2111

*Attorneys for Defendant Novo Nordisk Inc.*

WALLACE SAUNDERS

*/s/ Bryan E. Mouber*

Bryan E. Mouber, # 19710
bmouber@wallacesaunders.com
10111 West 87th Street
Overland Park, KS 66212
Phone: (913) 752-5511

James F. Hurst, P.C. (*pro hac vice*)
Andrew A. Kassof, P.C. (*pro hac vice*)
Diana M. Watral, P.C. (*pro hac vice*)
Ryan J. Moorman (*pro hac vice*)
Jason A. Feld (*pro hac vice*)
james.hurst@kirkland.com
akassof@kirkland.com
diana.watral@kirkland.com
ryan.moorman@kirkland.com
jason.feld@kirkland.com
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Phone: (312) 862-2000

*Attorneys for Defendant Eli Lilly and Company*

SHOOK, HARDY & BACON

_/s/ Robert J. McCully_
Robert J. McCully, #12433
rmccully@shb.com
2555 Grand Boulevard
Kansas City, Missouri  64108
Phone:  (816) 474-6550
Fax: (816) 421-5547

Shirlethia V. Franklin (_pro hac vice_)
Theresa C. Martin (_pro hac vice_)
William D. Coglianese (_pro hac vice_)
sfranklin@jonesday.com
tcoughlin@jonesday.com
wcoglianese@jonesday.com
JONES DAY
51 Louisiana Ave. NW
Washington, DC 20001
Phone: (202) 879-3939
Fax: (202) 626-1700

_Attorneys for Defendant Sanofi-Aventis U.S._
_LLC_

## CERTIFICATE OF SERVICE

I hereby certify that on March 30, 2023, the foregoing was filed via the Court's Clerk of the Court by using the CM/ECF System, which will send a notice of electronic filing to all attorneys of record.

/s/ Gary L. Ayers
Gary L. Ayers

Attorneys for Defendant Novo Nordisk Inc.
On Behalf of Manufacturer Defendants

23