# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

THE STATE OF KANSAS, EX REL. KRIS W.
KOBACH, ATTORNEY GENERAL,

*Plaintiff*,

v.

ELI LILLY AND COMPANY; ET AL

*Defendants.*

Case No. 5:23-cv-04002-EFM-RES

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
## MANUFACTURERS' MOTION TO DISMISS COMPLAINT
## <u>UNDER FED. R. CIV. P. 12(b)(6) AND 9(b)</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................... ii

FACTUAL ALLEGATIONS ......................................................................................... 1

ARGUMENT ................................................................................................................. 5

    **I.**      **Legal Standards and Application.** ................................................................ 5

          A.     Rule 12(b)(6). ................................................................................. 5

          B.     Rule 9(b). ........................................................................................ 6

          C.     The State's complaint satisfies the Heightened Pleading
                 Requirement. .................................................................................. 7

    **II.**     **The Complaint States Claims For Relief.** ............................................... 10

          A.     The KCPA Broadly Protects Consumers, Authorizing the Attorney
                 General to Prosecute Claims on their Behalf ............................... 10

          B.     Plaintiff States a Claim for Deceptive Conduct. ........................ 12

          C.     Plaintiff states a claim for Unconscionability. .......................... 16

          D.     Plaintiff's Claims are within the Scope of the KCPA .............. 18

    **III.**    **The Manufacturers' Legal Defenses Are Unavailing.** ....................... 21

          A.     Medicare Payment Methodology is Immaterial and Irrelevant to
                 the State's Claims. ...................................................................... 21

          B.     The complaint states a claim for Unjust Enrichment. ............... 24

          C.     The complaint states a claim for Civil Conspiracy ................... 25

CONCLUSION ........................................................................................................... 29

# TABLE OF AUTHORITIES

**Cases**

*Alexander v. Certified Master Builders Corp.*,
    1 P.3d 899 (Kan. 2000) ................................................................. 12

*American Fin. Serv. Ass'n v. FTC,*
    767 F.2d 957 (D.C. Cir. 1985) ....................................................... 16

*Anderson News, LLC v. Am. Media Inc.*,
    680 F.3d 162 (2d Cir. 2012) ........................................................... 26

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................ 5

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................. 5, 26

*Bruce v. Kelly*,
    514 P.3d 1007 (Kan. 2022) ........................................................... 23

*Cavlovic v. J.C. Penney Corp., Inc.*,
    2018 WL 2926433 (D. Kan. June 7, 2018) ............................... 5, 14

*Cement Mfr.s' Prot. Ass'n v. U.S.*,
    268 U.S. 588 (1925) ...................................................................... 29

*CIT Group/Sales Fin., Inc. v. E-Z Pay Used Cars, Inc.,*
    32 P.3d 1197 (Kan. App. 2001) .................................................... 12

*City of Miami v. Eli Lilly & Co.*,
    2022 WL 198028 (S.D. Fla. Jan. 21, 2022) ..................... 13, 22, 25

*Danker & Danker Public Relations v. McCants*,
    2015 WL 6629772 (Kan. App. 2015) ........................................... 12

*DeGorter v. FTC*,
    244 F.2d 270 (9th Cir. 1957) ....................................................... 14

*Dodson v. U-Needa Self Storage, LLC*,
    96 P.3d 667 (Kan. App. 2004) ................................................ 12, 17

*Elder v. Reliance Worldwide Corp.*,
    563 F. Supp. 3d 1221 (N.D. Ga. 2021) ........................................ 15

*Equitable Life Leasing Corp. v. Abbick*,
    757 P.2d 304 (Kan. 1988) ............................................................ 19

*Evergreen Partnering Grp., Inc. v. Pactiv Corp.*,
720 F.3d 33 (1st Cir. 2013) ............................................................... 27

*Finstad v. Washburn Univ. of Topeka*,
845 P.2d 685 (Kan. 1993) ................................................................. 11

*First Nat'l Bank of Anthony v. Dunning*,
855 P.2d 493 (Kan. App. 1993) ........................................................ 12

*FTC v. Affiliate Strategies, Inc.*,
2010 U.S. Dist. LEXIS 150661 (D. Kan. June 4, 2010) ....................... 6

*FTC v. Motion Picture Advert. Serv. Co.*,
344 U.S. 392 (1953) ......................................................................... 20

*George v. Urban Settlement Servs.*,
833 F.3d 1242 (10th Cir. 2016). ......................................................... 7

*Giant Food Inc. v. FTC*,
322 F.2d 977 (D.C. Cir. 1963) .......................................................... 13

*Gonzalez v. Pepsico, Inc.*,
489 F. Supp. 2d 1233 (D. Kan. 2007) ................................. 6, 10, 11, 24

*Hanover Ins. Co. v. First Midwest Bank of Poplar Bluff*,
2021 WL 5331474 (E.D. Mo. Nov. 16, 2021) ................................... 27

*Harris Cnty. v Eli Lilly & Co.*,
2022 U.S. Dist. LEXIS 27715 (S.D. Tex. Feb. 16, 2022) ..................... 9

*Harris Cnty., Texas v. Eli Lilly & Co.*,
2020 WL 5803483 (S.D. Tex. Sept. 29, 2020) ...................... 9, 13, 21, 29

*Has-Mat Response Inc. v. Certified Waste Servs. Ltd.*,
910 P.2d 839 (Kan. 1996) ................................................................. 25

*Hefner v. Deutscher*,
2023 Kan. App. Unpub. LEXIS 136 (Mar. 24, 2023) .......................... 29

*Hernandez v. Pistotnik*,
472 P.3d 110 (Kan. App. 2020) ........................................................ 10

*Illinois Brick Co. v. Illinois*,
431 U.S. 720 (1977) ........................................................................... 9

*In re Cattle Antitrust Litig.*,
2020 WL 5884676, (D. Minn. Sep. 29, 2020) ................................... 27

*In re Chocolate Confectionary Antitrust Litig.*,
    602 F. Supp. 2d 538 (M.D. Penn. 2009) ............................................................ 19

*In re Direct Purchaser Insulin Pricing Litig.*,
    2021 WL 2886216 (D.N.J. July 9, 2021) ............................................................ 13

*In re Insulin Pricing Litig.*,
    2019 WL 643709 (D.N.J. Feb. 15, 2019) ................................................. 9, 13, 29

*In re Motor Fuel Temperature Sales Practices Litig.*,
    534 F. Supp. 2d 1214 (D. Kan. 2008) ............................................................... 18

*In re Motor Fuel Temperature Sales Practices Litig.*,
    867 F. Supp. 2d 1124 (D. Kan. 2012) ................................................. 15, 17, 22

*In re Pharm. Industry Average Wholesale Price Litig.*,
    491 F. Supp. 2d 20 (D. Mass. 2007) ................................................................... 3

*In re Photochromic Lens Antitrust Litig.*,
    2011 WL 13141933 (M.D. Fla. Oct. 26, 2011) ................................................ 19

*In re Pre-Filled Propane Tank Antitrust Litig.*,
    860 F.3d 1059 (8th Cir. 2017) .......................................................................... 27

*In re Salmon,*
    2021 WL 1109128, (S.D. Fla. Mar. 23, 2021) ................................................. 27

*In re Tyson Foods, Inc. Sec. Litig.*,
    2018 WL 1598670 (W.D. Ark. Mar. 31, 2018) ................................................ 27

*In re Universal Serv. Fund Tel. Billing Prac. Litig.,*
    300 F. Supp. 2d 1107 (D. Kan. 2003) ......................................................... 20, 26

*In re Zetia Antitrust Litig.*,
    2019 WL 1297228 (E.D. Va. Feb. 2, 2019) ..................................................... 19

*J.W. Thompson Co. v. Welles Prods. Corp.*,
    758 P.2d 738 (Kan. 1988) ........................................................................... 24, 25

*Kan. Penn Gaming, LLC v. Collins*,
    656 F.3d 1210 (10th Cir. 2011) .......................................................................... 5

*Kelly v. VinZant*,
    197 P.3d 803 (Kan. 2008) ................................................................................. 10

Koch v. Koch Industries, Inc.,
    203 F.3d 1202 (10th Cir. 2000) .......................................................................... 6

*Kucharski-Berger v. Hill's Pet Nutrition, Inc.*,
    494 P.3d 283 (Kan. App. 2021) .......................................... 6, 10, 11, 14

*Little Kids, Inc. v. 18th Ave. Toys, Ltd.*,
    2020 WL 7264267 (D. R.I. Dec. 10, 2020) .............................................. 27

*Louisburg Bldg. & Dev. Co., LLC v. Albright*,
    252 P.3d 597 (Kan. App. 2011) .............................................................. 18

*Luttrell v. Brannon*,
    2018 WL 3032993 (D. Kan. Jun. 19, 2018).......................................... 18, 26

*Manley v. Wichita Business College*,
    701 P.2d 893 (Kan. 1985) ....................................................................... 13

*Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*,
    709 F.3d 129 (2nd Cir. 2013)................................................................. 27

*Minnesota ex rel. Ellison v. Sanofi-Aventis U.S. LLC*,
    2020 WL 2394155 (D.N.J. Mar. 31, 2020).................................... 9, 13, 21

*Mississippi ex rel. Fitch v. Eli Lilly & Co.*,
    2022 WL 3222890 (S.D. Miss. Aug. 9, 2022).............................. 9, 13, 28

*MSP Recovery Claims, Series, LLC v. Sanofi-Aventis U.S. LLC*,
    2019 WL 1418129 (D.N.J. Mar. 29, 2019)............................................. 13

*Nieberding v. Barrette Outdoor Living, Inc.*,
    302 F.R.D. 600 (D. Kan. 2014).......................................................... 11, 18

*NVLCC, LLC v. NV Lenexa Land Holdings, LLC*,
    519 P.3d 1236 (Kan. App. 2022) ........................................................... 26

*Othi v. Holder*,
    734 F.3d 259 (4th Cir. 2013) ................................................................. 23

*Pharm. Care Mgmt Ass'n v. District of Columbia*,
    522 F.3d 443 (D.C. Cir. 2008)............................................................... 13

*Ray v. Ponca/Universal Holdings, Inc.*,
    913 P.2d 209 (Kan. App. 1995) ............................................................ 14

*Ridge at Red Hawk, LLC v. Schneider*,
    493 F.3d 1174 (10th Cir. 2007) ............................................................... 5

*Roe v. Phillips Cnty. Hosp.*,
    522 P.2d 277 (Kan. 2023)...................................................................... 23

*Schneider v. Liberty Asset Mgmt.*,
251 P.3d 666 (Kan. App. 2011) ................................................................. 10

*Schoenbaum v. E.I. Dupont De Nemours & Co.*,
517 F. Supp. 2d 1125 (E.D. Mo. 2007)............................................... 15, 19

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
801 F.3d 412 (4th Cir. 2015) ..................................................................... 27

*Sherrell by and through Wooden v. Longview*,
683 F. Supp. 1108 (E.D. Tex. 1987) ......................................................... 30

*Smith v. Fenner*,
1999 WL 592663 (N.D. Tex. Aug. 6, 1999).............................................. 29

*Spiegel, Inc. v. FTC*,
411 F.2d 481 (7th Cir. 1969) ..................................................................... 13

*Stair v. Gaylord*,
659 P.2d 178 (Kan. 1983) ..................................................................... 11, 12

*State ex rel. Kline v. Transmasters Towing*,
168 P.3d 60 (Kan. App. 2007) ................................................................ 6, 18

*State ex rel. Mays v. Ridenhour*,
811 P.2d 1220 (Kan. 1991)......................................................................... 26

*State ex rel. Stephan v. Brotherhood Bank & Trust Co.*,
649 P.2d 419 (Kan. App. 1982) .............................................................. 6, 11

*State ex rel. Stoval v. ConfiMed.com, LLC*,
38 P.3d 707 (Kan. 2002) .................................................................. 6, 16, 17

*State ex rel. Stovall v. DVM Enter., Inc.*,
62 P.3d 653 (Kan. 2003) ............................................................................ 17

*Triangle Conduit & Cable Co. v. FTC*,
168 F.2d 175 (7th Cir. 1948) ..................................................................... 29

*U.S. v. Socony-Vacuum Oil Co., Inc.*,
310 U.S. 150 (1940).................................................................................... 29

*Unruh v. Purina Mills, LLC*,
221 P.3d 1130 (Kan. 2009) ........................................................................ 15

*Via Christi Regional Med. Center, Inc. v. Reed*,
314 P.3d 852 (Kan. 2013) .......................................................... 16, 17, 18, 22

*Watkins v. Roach Cadillac, Inc.*,
　　637 P.2d 458 (Kan. App. 1981) ............................................................. 13

*Willman v. Ewen*,
　　627 P.2d 1190, (Kan. App. 1981) .......................................................... 16

**Statutes**

15 U.S.C.A. § 45(a)(1) ........................................................................................ 13

42 U.S.C. § 1395w(c)(6)(B) ................................................................................ 23

42 U.S.C. § 1395w-3a(c)(6)(B) .................................................................... 21, 23

K.S.A. § 50-623 *et seq.* ........................................................................................ 1

K.S.A. § 50-623(b) ............................................................................................. 10

K.S.A. § 50-624(l) .............................................................................................. 11

K.S.A. § 50-626(a) ............................................................................................. 12

K.S.A. § 50-626(b) ....................................................................................... 10, 12

K.S.A. § 50-627(a) ............................................................................................. 16

K.S.A. § 50-627(b) ................................................................................... 6, 16, 17

K.S.A. § 50-628(a)(1) ........................................................................................... 1

K.S.A. § 50-632(a) ............................................................................................... 1

K.S.A. § 50-634(a) ............................................................................................. 10

K.S.A. § 50-636 .................................................................................................... 1

K.S.A. § 50-801(b) ............................................................................................. 19

**Other Authorities**

Prof. Ellen Byers,
　　*Addressing the Consumer's Worst Nightmare: Toward a More Expansive*
　　*Development of the Law of Tortious Fraud and Deceptive Practices in Kansas,* 38
　　Washburn Law Journal 455 (1999) ...................................................... 11

**Rules**

Fᴇᴅ. R. Cɪᴠ. P. 12(b)(6) ............................................................................. 1, 5, 29

Fᴇᴅ. R. Cɪᴠ. P. 8 ............................................................................................. 6, 9

Fᴇᴅ. R. Cɪᴠ. P. 9(b) ....................................................................................... 6, 9

*Fraud and Abuse; Removal of Safe Harbor Protection for Rebates Involving Prescription*
    *Pharmaceuticals*, 85 Fed. Reg. 76666 (Nov. 30, 2020) ....................................... 24

COMES NOW the State of Kansas, *ex rel*. Kris W. Kobach, its Attorney General, and respectfully submits this Memorandum in Opposition to the Motion to Dismiss the Complaint, pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b), filed by the Manufacturers, Eli Lilly and Company, Novo Nordisk Inc., and Sanofi-Aventis U.S. LLC (Dkt. 82). Plaintiff responds in opposition to the Motion and accompanying Memorandum (Dkt. 83), as follows:

## FACTUAL ALLEGATIONS

Acting pursuant to his statutory duty to enforce the Kansas Consumer Protection Act, the Honorable Kris W. Kobach, Attorney General, filed this action against the Defendants to protect the health and economic well-being of the State of Kansas (the "State") and its citizens, including diabetics and their families who reside in Kansas.[1] (¶¶ 1, 34, 193-194).[2]

Pursuant to common law and K.S.A. § 50-623 *et seq.*, the Kansas Consumer Protection Act ("KCPA"), the State seeks damages on behalf of its consumers, damages, restitution, civil penalties, reasonable attorneys' fees and expenses, and injunctive relief to enjoin and address Defendants' misconduct and KCPA violations in which the Defendants continue to engage through the present date.[3] (¶¶ 36, 442). This action, necessitous with respect to hundreds of thousands of Kansans who rely on insulin for health maintenance and survival (¶¶ 1, 4, 201), challenges the unconscionable and deceptive pricing system for insulin and diabetes medications.[4] This system

---

[1] K.S.A. § 50-628(a)(1) ("The attorney general shall … [e]nforce this act throughout the state").

[2] All references in this Memorandum to parenthetical paragraph citation—such as (¶¶ 1, 34, 193-194) above—are citations to the individually-numbered paragraphs of Plaintiff's Petition, filed as Dkt. 1-1 in this action (referred to herein as "complaint").

[3] *See,* K.S.A. § 50-632(a) (authorizing the Attorney General to seek declaratory and injunctive relief and recover consumer damages and reasonable expenses), and K.S.A. § 50-636 (civil penalties).

[4] This action clearly serves the public interest. Diabetes is a health epidemic that affects approximately 10% of Kansas's citizens; is the seventh-leading cause of death in Kansas; and carries with it a host of related medical complications such as blindness, kidney failure, and lower limb amputation. Approximately 50,000 Kansans rely on daily insulin treatments to survive, and the remainder of impacted Kansans rely on insulin and diabetes medications for crucial health maintenance. (¶¶ 1–4). The economic impact of diabetes on the State and its citizens, including but not limited to healthcare costs, is approximately $2.4 billion per year. (¶ 3).

is corrupted by an Insulin Pricing Scheme, devised and executed by two sets of actors—the Manufacturer Defendants ("Manufacturers")[5] and the Pharmacy Benefit Manager Defendants ("PBMs").[6]

Both the Manufacturers and the PBMs are integral to the scheme by which insulin list prices have undergone artificial inflation and become false. (¶ 20). The Manufacturers produce ninety-nine percent (99%) of all insulins available in the Kansas and the United States. (¶¶ 5, 219). The PBMs provide pharmacy benefit services for 80% of the covered lives in the United States and dominate the pricing system for the at-issue drugs, controlling their access to the market and ensuring that the Manufacturers' list prices are utilized as the basis for payments made by all downstream payors and consumers, including Kansas's citizens.[7] (¶¶ 6, 9, 11, 286).

The scheme is multi-faceted: First, to secure access on the PBMs' formularies, the Manufacturers artificially inflate the prices of their diabetes medications to finance significant Manufacturer Payments made to the PBMs.[8] (¶¶ 20, 307-329). Second, the Manufacturers publicly

---

[5] The Manufacturer Defendants are Eli Lilly and Company ("Eli Lilly"), Sanofi-Aventis U.S. LLC ("Sanofi"), and Novo Nordisk Inc. ("Novo Nordisk"). (¶ 79). The complaint identifies the insulin and diabetes medications at issue in this action, including the product names of the respective diabetes medications (insulin and non-insulin adjunct medications) that Eli Lilly, Sanofi, and Novo Nordisk manufacture and sell. (¶¶ 6 n. 1, 44, 57, 70).

[6] The PBM Defendants are (a) Evernorth Health Inc., Express Scripts Inc., Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy Inc., and Medco Health Solutions Inc., collectively referred to as "Express Scripts" (¶ 157); (b) CVS Health Corporation, CVS Pharmacy, Inc., Caremark Rx LLC, CaremarkPCS Health, LLC, and Caremark, LLC, collectively referred to as "CVS Caremark" (¶ 108); and (c) OptumRx Inc. ("OptumRx") (¶ 172). The State joins Express Scripts, CVS Caremark, and OptumRx as defendants in their capacities as PBMs and as owners and operators of retail and/or mail-order pharmacies which sell and dispense the at-issue drugs directly to diabetic and pre-diabetic citizens of Kansas. (¶¶ 109, 158, 178).

[7] The Manufacturers' artificially-inflated and false list prices increase the prices paid for the at-issue drugs by all downstream payors and purchasers. The complaint alleges that the prices paid by nearly every diabetic and payor in Kansas for the at-issue drugs are based on the false manufacturer list prices generated by the Insulin Pricing Scheme. (¶¶ 27, 52, 65, 78). Thus, every diabetic and payor in Kansas—including uninsured Kansans who pay point-of-sale prices, and insured Kansans who pay higher coinsurance and co-pays—have been overcharged for the at-issue drugs. (¶¶ 263-264).

[8] Manufacturer Payments, not limited to "rebates," include all forms of remuneration, such as administrative fees, inflation fees, pharmacy supplemental discounts, volume discounts, price or margin guarantees, etc. Such a broad definition is necessary because PBMs frequently reclassify and relabel their revenue streams to avoid disclosure of remuneration that PBMs formerly labeled as "rebates." (¶¶ 20 n. 3, 358).

report the false list prices to publishing compendia, with knowledge that their list prices will increase the prices paid by the State's citizens.[9] (¶¶ 50, 63, 76). Third, PBMs falsely represent that they use their formularies and market power to negotiate lower prices from the Manufacturers. (¶¶ 22, 321-322, 328, 406-407, 431, 461).

The deception is stark. The Manufacturers report false list prices to fund Manufacturer Payments, and the PBMs misuse their formularies to capture increasing Manufacturer Payments, despite the PBMs' repeated representations that their businesses are modeled on lowering costs and promoting diabetic health. (¶ 349: "2021 Senate Insulin Report," finding that the "vicious cycle of price increases" of insulin is attributable to "PBMs spur[ring] drug makers to hike list prices in order to secure prime formulary placement and [pay] greater rebates and fees"). In turn, the PBMs grant preferred, sometimes exclusive, formulary status to the at-issue drugs with the highest (albeit false) list prices (¶ 22), and then use the false list prices to set the rate that payors and patients pay for the at-issue drugs. (¶¶ 276, 353, 384). The Manufacturers likewise conceal the reasons for the incredible inflation of insulin list prices, falsely claiming that price hikes are the result of research and development costs and innovation. (¶ 399).

The United States Senate's January 2021 Report on insulin pricing, entitled *Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug*, (¶¶ 167, 315-316), was released after the Senate's review of the Defendants' internal documents and was the first reliable investigative report pertaining to the Insulin Pricing Scheme. Among other things, the Senate

---

[9] The Wholesale Acquisition Cost ("WAC"), which the Manufacturers report, is the starting point for all downstream pricing metrics in the pharmacy pricing chain. The WAC price is mathematically related to the Average Wholesale Price ("AWP") (¶¶ 258-259), which is typically set at a premium of 20% to 25% higher than the reported WAC. *In re Pharm. Industry Average Wholesale Price Litig.*, 491 F. Supp. 2d 20, 33 (D. Mass. 2007). While it is true that different actors pay different prices for the same drugs, the AWP and all other downstream prices derive from the reported WAC. The unifying factor is that the price paid by each payor/consumer in the pharmaceutical pricing chain is elevated as a result of the false WAC list prices generated by the Insulin Pricing Scheme. (¶¶ 258, 262).

Insulin Report confirmed certain facts essential to the State's claims, including (1) that Manufacturer Payments on insulin products escalated from single digit percentages in the early 2010s to 50% or greater of the reported WAC price (¶ 348); (2) that the sharp escalation in insulin prices is not attributable to research and development costs or improvements in efficacy (¶ 348); and (3) that Manufacturer Payments are the primary culprit for the artificial inflation of insulin and diabetic drug prices. (¶ 349).

Acting in concert, the Manufacturers and PBMs have inflated insulin prices to the point of fiction and falsity. The list prices for this century-old drug are not based on the costs of production, research and development, or innovation.[10] (¶¶ 13, 17, 225-226, 232, 332, 347, 352, 348-349, 397). Rather, the at-issue diabetes drugs are captive to "a vicious cycle of price increases" in an "industry [that] is anything but a free market." (¶ 349, 2021 Senate Insulin Report). Since 2003, the Manufacturers have inflated the list prices of certain insulins by more than 1000%, far outpacing the 46% rate of medical inflation over the same time period. (¶ 239).

The complaint alleges that the Manufacturers misrepresent the actual prices of their diabetes medications and report and publish false list prices in furtherance of the scheme. (¶¶ 21, 323). The list prices are artificially inflated, false, and—in actuality—not the prices paid by any entity in the pharmaceutical pricing chain.[11] (¶¶ 259, 327).

This scheme is broader and more complex than just the "rebates" on which the Manufacturers unduly focus. The State's complaint alleges that "the entire insulin pricing structure created by the Defendants—from the false prices, to the Manufacturers' misrepresentations related

---

[10] The skyrocketing prices of insulin from 2003 to present are not justified by any scientific advances or innovations; today's insulins are the same or biologically equivalent to those available in the late 1990s. (¶¶ 224-225, citing 2018 JAMA study). Further, the cost to produce the at-issue drugs has decreased during the same time period. (¶ 13).

[11] Contrary to the Manufacturers' contention, the State disputes that the Manufacturers accurately or correctly reported their list prices. The State's pleading is replete with allegations that the reported prices are false. (¶¶ 21 ("false"), 323 ("false" and "unlawful"), 392 ("artificially inflated" and "false"), and 393 ("unlawful")).

to the reason behind the price, to the inclusion of the false prices in payor contracts, to the non-transparent Manufacturer Payments, to the misuse of formularies, to the PBMs' [mis]representations that they work to lower prices and promote the health of diabetics—is unconscionable and deceptive." (¶ 431). As a result, the State's diabetic citizens overpay by millions of dollars a year for the at-issue drugs. (¶¶ 29, 51, 64, 77).

## ARGUMENT

### I. Legal Standards and Application.

#### A. Rule 12(b)(6).

To survive a motion to dismiss under FED. R. CIV. P. 12(b)(6), a complaint must present factual allegations, assumed to be true, that "raise a right to relief above the speculative level" and contain "enough facts to state a claim to relief that is plausible on its face." *Cavlovic v. J.C. Penney Corp., Inc.*, 2018 WL 2926433, at *1 (D. Kan. June 7, 2018) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007)). "[T]he complaint must give the court reason to believe that [the] plaintiff has a reasonable likelihood of mustering factual support for [its] claims." *Ridge at Red Hawk, LLC v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

The plausibility standard does not require a showing of probability that a defendant acted unlawfully, but requires more than a "sheer possibility." *Cavlovic*, 2018 WL 2926433, at *1 (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "[M]ere 'labels and conclusions,' and 'a formulaic recitation of the elements of a cause of action' will not suffice; a plaintiff must offer specific factual allegations to support each claim." *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (quoting *Twombly*, 550 U.S. at 555). The court must accept the nonmoving party's factual allegations as true and may not dismiss on the ground that it appears unlikely the allegations can be proven. *Iqbal*, 556 U.S. at 678.

Since the unconscionability of an act or practice is a question of law for the court, such claims should be assessed on a case-by-case basis after review of the written documents and witness testimony. K.S.A. § 50-627(b); *State ex rel. Kline v. Transmasters Towing*, 168 P.3d 60, 64 (Kan. App. 2007); *State ex rel. Stoval v. ConfiMed.com, LLC*, 38 P.3d 707, 713 (Kan. 2002). In contrast, KCPA claims asserting deception present a question of fact for decision by the jury. *Kucharski-Berger v. Hill's Pet Nutrition, Inc.*, 494 P.3d 283, 292 (Kan. App. 2021).

### B. Rule 9(b).

The Kansas Court of Appeals has explained that under the KCPA "[t]he Attorney General is granted broad investigatory and rulemaking authority for the purpose of protecting the public from unscrupulous suppliers and is given the discretion to exercise these powers in a manner which will further the public interest. *State ex rel. Stephan v. Brotherhood Bank & Trust Co*., 649 P.2d 419, 423 (Kan. App. 1982). Given this broad grant of authority, courts in this District have "decline[d] to impose upon the Attorney General the obligation of pleading 'who, what, where, and when' when he or she brings a claim to protect the public interest." *FTC v. Affiliate Strategies, Inc.*, 2010 U.S. Dist. LEXIS 150661, at *26 (D. Kan. June 4, 2010). Because the State has brought this case under its authority to protect the public interest, Rule 8's plausibility standard applies.

Even if Rule 9(b), did apply (it does not if the Court utilizes the *Brotherhood Bank* analysis), the State has pled its KCPA claims with particularity. In the Tenth Circuit, Rule 9(b) only requires a party to allege "the time, place and content of the alleged wrongful conduct, as well as the identities of the wrongdoers." *Gonzalez v. Pepsico, Inc.*, 489 F. Supp. 2d 1233, 1246 (D. Kan. 2007). The Tenth Circuit has never held that Rule 9(b) requires plaintiffs to plead "how" or "why" alleged misrepresentations are actually false. *Koch v. Koch Industries, Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000). Rule 9(b) does not require "omniscience," but merely that the misrepresentation are pled with enough particularity to put defendants on notice as to the nature

of the claim. *George v. Urban Settlement Servs.*, 833 F.3d 1242, 1257 (10th Cir. 2016). The State's allegations satisfy these requirements.

**C.     The State's complaint satisfies the Heightened Pleading Requirement.**

The complaint alleges adequate particularized facts which establish the Insulin Pricing Scheme and support its claims for relief under the KCPA, for unjust enrichment, and for civil conspiracy. The complaint does not, as the Manufacturers contend, inappropriately "lump" them together. With respect to their involvement in the Insulin Pricing Scheme, the complaint specifically identifies each of the Manufacturers by conduct, drugs, pricing, dates, and testimonial or other admissions.

Among other things, the complaint alleges:

(1)     The Manufacturer Defendants raise list prices of the at-issue drugs as a direct result of national negotiations and agreements with the PBMs (¶¶ 119, 171, 190). The prices paid by diabetic Kansas consumers are based on the Manufacturers' list prices. (¶¶ 27, 52, 168). The Manufacturers report and publish the list prices generated by the Insulin Pricing Scheme in the United States and Kansas through publishing compendia and in promotional and marketing materials; the list prices are utilized by the PBMs to set the prices paid by the Kansas diabetics for the at-issue drugs. (¶¶ 260, 394-395);

(2)     The Manufacturers artificially inflate the reported list prices as part of the Insulin Pricing Scheme, such that the reported list prices are false, not tethered to any competitive or fair market value, and dod not bear a reasonable relationship to the actual prices which the Manufacturers realize on the sale of the at-issue drugs. (¶¶ 21, 323, 392-393). Artificial price inflation by the Manufacturers is *quid pro quo* for inclusion of the at-issue drugs on the PBMs' formularies. (¶ 20, 337).

(3)     The complaint specifically identifies the at-issue medications involved in the Insulin Pricing Scheme by drug name, manufacturer, and price. (¶¶ 6, 258 Table 1). The complaint presents specific examples of each Manufacturer's price increases by drug, date, and the amount/percentage of price increase. *See,* Figures 1-3 reflecting price increases by Eli Lilly (¶¶ 16, 241-242); Figures 4-5 reflecting price increases by Novo Nordisk (¶¶ 243-244); and Figure 6 reflecting price increases by Sanofi (¶ 245). In thirteen instances since 2009, and pursuant to the Insulin Pricing Scheme, the Manufacturers increased their respective prices of the at-issue drugs in lockstep, even though their costs of production decreased over the same time period. (¶¶ 13, 248-255). *See,* Figures 7-9 & 11 reflecting lockstep price increases by each Manufacturer (¶¶ 248-255);

(4)     Executive-level officers or representatives of the Manufacturers and/or PBMs admitted, before the United States Congress or in other forums, that the price of insulin has increased dramatically in the past fifteen years (¶ 332, admissions by all Defendants); that there is a "lack of meaningful competition" in the insulin market (¶ 332, admission by OptumRx's Chief Medical Officer); that diabetics lack "affordable access" to insulin (¶ 332, admission by Eli Lilly Senior Vice President); and that the "[reported] price" of insulin matters to both insured and uninsured diabetics (¶ 332, admission by Novo Nordisk Executive Vice President); and

(5)     The Manufacturers, through their officers and representatives, admitted to engaging in the overt acts which mark the Insulin Pricing Scheme: Novo Nordisk admitted that "we've been participating in [the insulin pricing system] because the higher the [reported] price, the higher the rebate," (¶ 336); Sanofi admitted that "rebates generated through negotiations with PBMs are being used to finance other parts of the healthcare

system and not to lower prices to the patient," (¶ 338); and Eli Lilly admitted that it raised

its reported prices for insulin as *quid pro quo* for formulary position, since "***[s]eventy-five***

***percent of our [reported] price is paid for rebates and discounts to secure [formulary***

***position]***." (¶ 337).

The allegations of the State's complaint surpass both Rule 8 and Rule 9(b)'s heightened

pleading requirement, and multiple district courts have so ruled in finding that Insulin Pricing

Scheme allegations identical or substantially similar to those in the State's complaint comport with

Rule 9(b). *See Mississippi ex rel. Fitch v. Eli Lilly & Co.*, 2022 WL 3222890, at *6 (S.D. Miss.

Aug. 9, 2022) (Mississippi's 118-page complaint delineates each Manufacturer's participation in

the "Insulin Pricing Scheme," including specific drugs, prices, timelines, knowledge, and intent,

and sufficiently asserts the "who, what, when, where, and how" of the alleged misconduct); *Harris*

*Cnty., Texas v. Eli Lilly & Co.*, 2020 WL 5803483, at *5 (S.D. Tex. Sept. 29, 2020) (Insulin Pricing

Scheme allegations satisfied Rule 9(b));[12] *Minnesota ex rel. Ellison v. Sanofi-Aventis U.S. LLC*,

2020 WL 2394155, at *17 (D.N.J. Mar. 31, 2020) (same conclusion with respect to particularity

of allegations); and *In re Insulin Pricing Litig.*, 2019 WL 643709, at *14-15 (D.N.J. Feb. 15, 2019)

(Insulin Pricing Scheme allegations satisfied Rule 9(b) particularity requirement).

---

[12] The district court in *Harris Cnty.* later dismissed all defendants on a ground which does not relate to its Rule 9(b) ruling. *See Harris Cnty. v Eli Lilly & Co.,* 2022 U.S. Dist. LEXIS 27715 (S.D. Tex. Feb. 16, 2022). Specifically, the court concluded that the direct purchaser rule established by *Illinois Brick Co. v. Illinois,* 431 U.S. 720 (1977) applies to claims asserted under the Texas consumer protection act (*id.* at *38), a defense which the Defendants do not assert and which is not available under Kansas law. Thus, the Rule 9(b) ruling of the district court in *Harris Cnty.* remains undisturbed.

## II.    The Complaint States Claims For Relief.

### A.    The KCPA Broadly Protects Consumers, Authorizing the Attorney General to Prosecute Claims on their Behalf

The KCPA provides relief broader than that afforded by common-law fraud and is "construed liberally to … protect consumers from suppliers who commit deceptive and unconscionable practices." K.S.A. § 50-623(b); *Hill's Pet Nutrition*, 494 P.3d at 293. A critical element of fraud—the intent to defraud—need not be proven; the KCPA prohibits deceptive acts and practices whether or not a consumer is in fact misled. *Kelly v. VinZant*, 197 P.3d 803, 812 (Kan. 2008) (citing K.S.A. § 50-626(b)). Accordingly, in private actions proof of reliance is not required. *Schneider v. Liberty Asset Mgmt.*, 251 P.3d 666, 671 (Kan. App. 2011).

Rather, private actions may be maintained by "aggrieved" consumers who demonstrate a causal connection between a KCPA violation and their injury. *Id.*; K.S.A. § 50-634(a). "To be aggrieved under the statute, the consumer must prove that the seller's act has adversely affected the consumer's legal rights … that there [is] a causal connection between the deceptive act and the claimed injury." *Hernandez v. Pistotnik*, 472 P.3d 110, 117 (Kan. App. 2020) (no requirement that consumer must "have relied upon" deceptive act).

The injury component may be established by allegations of economic loss, which is a "paradigmatic form of injury in fact." *Gonzalez*, 489 F. Supp. 2d at 1240 (the difference between the purchase price and actual value is sufficient injury for a KCPA claim); *see also Hill's Pet Nutrition*, 494 P.3d at 295 (finding plaintiff aggrieved because deceptive marketing practices caused "the price of the pet food [to be] significantly higher than it should be").

This requirement of private actions—aggrievement—is not applicable to KCPA actions brought by the Attorney General on behalf of the State and its citizens. An action by the Attorney

General arises out of his duty to enforce the KCPA and constitutes a governmental function.[13] *Brotherhood Bank*, 649 P.2d at 424. The Attorney General is not required to prove "[a] loss or injury resulting from a violation of the [KCPA]," and the State's authority to prosecute the action is not diminished by the remedies available to the Attorney General, including the right to recover damages sustained by consumers. *See, Finstad v. Washburn Univ. of Topeka*, 845 P.2d 685, 691 (Kan. 1993); *Brotherhood Bank*, 649 P.2d at 424 ("Whether one consumer, ten or one hundred consumers, may receive actual damages as a result of a suit by the attorney general does not diminish the … state's interest in protecting consumers …").

The Attorney General may therefore prosecute KCPA claims against "supplier[s]," including "manufacturer[s]" or "seller[s]" which engage in consumer transactions, "whether or not dealing directly" with consumers. K.S.A. § 50-624(l). The Manufacturers do not dispute their status as KCPA suppliers: "The Manufacturers are pharmaceutical companies that research, develop, manufacture and sell prescription drugs, including insulin." Dkt. 83 at 7.

Furthermore, the fact that the Manufacturers do not sell insulin directly to Kansas consumers does not alter their KCPA liability.[14] K.S.A. § 50-624(l) ("whether or not dealing directly"); *see also Hill's Pet Nutrition*, 494 P.3d at 292 (consumer stated KCPA claim against remote manufacturers of pet food); *Gonzalez*, 489 F. Supp. 2d at 1249 (allegation that sodas contained benzene adequately stated KCPA claim against multiple manufacturers); *Nieberding v. Barrette Outdoor Living, Inc.*, 302 F.R.D. 600, 613 (D. Kan. 2014) (certifying KCPA class claims against retailer and manufacturer); *Stair v. Gaylord*, 659 P.2d 178, 186 (Kan. 1983) (evidence

---

[13] Accordingly, the statute of limitations does not bar a KCPA action brought by the Attorney General. *Brotherhood Bank,* 649 P.2d at 424.

[14] *See,* Prof. Ellen Byers*, Addressing the Consumer's Worst Nightmare: Toward a More Expansive Development of the Law of Tortious Fraud and Deceptive Practices in Kansas,* 38 Washburn Law Journal 455, 488 (1999) (under KCPA's definition of supplier, "[p]rivity requirements are abolished, bringing remote suppliers and sellers within the reach of the consumer").

made out KCPA claims against irrigation system dealer and manufacturer of defective component part).

"A party may be a supplier whether or not it deals directly with the consumer."[15] *Alexander v. Certified Master Builders Corp.*, 1 P.3d 899, 909 (Kan. 2000); *see also, Dodson v. U-Needa Self Storage, LLC*, 96 P.3d 667, 672 (Kan. App. 2004) (lack of a contract between the parties "is irrelevant because [plaintiffs] claim a violation of [the KCPA], not breach of contract").

### B.    Plaintiff States a Claim for Deceptive Conduct.

K.S.A. § 50-626(a) prohibits a supplier from engaging in any deceptive act or practice "in connection with" a consumer transaction. *U-Needa Self Storage,* 96 P.3d at 672. The deceptive acts and practices enumerated in the statute are non-exhaustive, but include (1) representations made knowingly or with reason to know that property has "characteristics" that it does not have; (2) the willful use in any representation of "exaggeration, falsehood, innuendo or ambiguity" as to a material fact; and (3) the willful failure to state, or the willful concealment, suppression or omission of, a material fact. K.S.A. § 50-626(b).

The allegations of the complaint, taken as true, satisfy these elements of a KCPA deception claim. As an initial matter, the price of property is a "material term" of a contract for the same, and obviously, a characteristic of the property. *Danker & Danker Public Relations v. McCants*, 2015 WL 6629772, at *8 (Kan. App. 2015). The Manufacturers report and publish list prices (*i.e.,*

---

[15] In reply, the Manufacturers may erroneously argue that the KCPA requires a direct purchaser relationship. Any such contention by the Manufacturers is inconsistent with the KCPA's definition of "supplier" and may rely on dicta which originated in *CIT Group/Sales Fin., Inc. v. E-Z Pay Used Cars, Inc.,* 32 P.3d 1197, 1204 (Kan. App. 2001). The court in *CIT Group* cited *First Nat'l Bank of Anthony v. Dunning,* 855 P.2d 493 (Kan. App. 1993) for the proposition that consumers who "directly contract" with suppliers may bring KCPA claims. *CIT Group,* 32 P.3d at 1204. Examination of the *Dunning* decision reveals that the *Dunning* court did not consider the statutory definition of "supplier" or engage in any other statutory construction and drew a conclusion based on the happenstance that "recent cases where the KCPA was applied" involved contracting parties. One of those "recent" cases cited by the *Dunning* court is *Stair,* 659 P.2d at 186, in which the Kansas Supreme Court upheld the plaintiff's KCPA claim against a remote manufacturer with which the plaintiff did not directly contract. *See, Dunning,* 855 P.2d at 498.

representations) which the Manufacturers know are artificially inflated and false. (¶¶ 50, 63, 76, 260, 392). Willfulness is shown by the Manufacturers' repeated use and reporting of the false list prices, year-over-year since 2003. (¶¶ 13, 20, 22). Further, the Manufacturers willfully fail to disclose that their list prices are artificially inflated (¶¶ 389, 461, 464) and willfully attempt to conceal the falsity of their list prices.[16] (¶ 346, 399-400, citing the Manufacturers' attempts to blame the PBMs and/or research and develop costs for the high price of insulin).

Specifically with respect to insulin, multiple federal court decisions, including but not limited to *Mississippi*, 2022 WL 3222890, at *6, hold that the acts and practices which comprise the Insulin Pricing Scheme, including the publishing, utilizing or promoting of artificially-inflated insulin prices, state consumer protection claims for fraudulent or deceptive conduct.[17]

Court interpreting the Federal Trade Commission Act, on which the KCPA is modeled, have reached similar holdings as to the deceptive nature of false or fictitious pricing.[18] *See, e.g., Spiegel, Inc. v. FTC*, 411 F.2d 481, 483 (7th Cir. 1969) (fictitious price "constitutes a material influence on the consumer's decision to purchase" and has "long been held a deceptive practice"); *Giant Food Inc. v. FTC*, 322 F.2d 977, 982 (D.C. Cir. 1963) (fictitious "manufacturer's list price"

---

[16] Concealment is also demonstrated by the complete lack of transparency in the insulin pricing system. (¶ ¶ 256, 404). The Manufacturers closely guard their pricing structures, agreements and sales figures, utilizing confidentiality provisions to prohibit disclosure of the actual prices they receive for insulin products. (¶¶ 423-424). As evidence by a case on which the Manufacturers rely, lawsuits are filed to enjoin governmental attempts to force disclosure of the pricing structures. (¶ 306). *See, Pharm. Care Mgmt Ass'n v. District of Columbia*, 522 F.3d 443, 444 (D.C. Cir. 2008) (lawsuit seeking injunction to block enforcement of District of Columbia's AccessRx Act of 2004 which would have required, among other things, disclosure of contracts between the Manufacturers and PBMs).

[17] *See, City of Miami v. Eli Lilly & Co.*, 2022 WL 198028, at *8 (S.D. Fla. Jan. 21, 2022); *In re Direct Purchaser Insulin Pricing Litig.*, 2021 WL 2886216, at *14–15 (D.N.J. July 9, 2021); *Harris Cnty.*, 2020 WL 5803483, at *16; *Minnesota*, 2020 WL 2394155, at *17; *MSP Recovery Claims, Series, LLC v. Sanofi-Aventis U.S. LLC*, 2019 WL 1418129, at *19 (D.N.J. Mar. 29, 2019); and *In re Insulin Pricing Litig.*, 2019 WL 643709, at *14-15.

[18] The KCPA is patterned on the Federal Trade Commission Act ("FTCA"), 15 U.S.C.A. § 45(a)(1). *Watkins v. Roach Cadillac, Inc.*, 637 P.2d 458, 463 (Kan. App. 1981). The Kansas Supreme Court has employed FTCA guidance in its interpretation and application of the KCPA. *See, Manley v. Wichita Business College*, 701 P.2d 893, 898 (Kan. 1985). The State respectfully submits that FTCA decisions should be persuasive on the issues presented in the instant action.

was false and deceptive); and *DeGorter v. FTC*, 244 F.2d 270, 281 (9th Cir. 1957) (manufacturer's pricing system bore the "badge of deceit").

Depending on the particular facts, Kansas state and federal courts have viewed allegations of excessive or false pricing as setting forth claims for deception. *See, e.g., Ray v. Ponca/Universal Holdings, Inc.*, 913 P.2d 209, 212 (Kan. App. 1995) (overcharging of cable television customer violated K.S.A. 50-626(b)((7) which prohibits false representations concerning price reductions).

In *Cavlovic*, 2018 WL 2926433, J.C. Penney advertised "fake" former prices "to deceive[ ] customers into thinking that the false former prices are what J.C. Penney regularly charges," which mislead the customers into buying J.C. Penney's merchandise "at illusory [discounted] prices." *Id.* at *1, 3. Many of the discounted prices were higher than J.C. Penney's actual, customary prices for the same items. *Id.* at *3. Viewing the claim as one for deception, the Kansas District Court held that the plaintiff stated a plausible claim for fraud under the KCPA. *Id.* at *6.

In *Hill's Pet Nutrition*, 494 P.3d at 287, the court assessed allegations of "excessive, inflated prices" as claims for deception. The plaintiff sued a per food manufacturer, alleging that it and other manufacturers conspired to monopolize the pet food market and "artificially inflate" prices by self-imposing a requirement to obtain veterinary prescriptions for their pet food. *Id.* at 287. The court held that plaintiff sufficiently alleged "deceptive marketing practices" that presented a question of fact for the jury. *Id.* at 292, 295.

Arguing that they have no duty to disclose to consumers the truth about their list prices, the Manufacturers contend that the State's willful-omission claim fails. Beyond the sheer logic that such a duty should arise from their affirmative publication of false list prices, the Manufacturers overlook that a duty of disclosure may arise from the nature of the consumer transaction itself. *In re Motor Fuel Temperature Sales Practices Litig.*, 867 F. Supp. 2d 1124, 1139

(D. Kan. 2012). A supplier is required to disclose material facts if it knows that the consumer is entering a transaction under a mistake as to the facts, and because of the relationship between consumer and seller, the customs in trade or other objective circumstances, the consumer would reasonably expect disclosure of such facts. *Id.* The objective circumstances presented in this action give rise to a reasonable inference that Kansas consumers reasonably expect to be informed that their insulin prices derive from the Manufacturers' artificially inflated and false list prices: the Manufacturers make approximately 99% of all insulins available in Kansas (¶ 219); Kansas diabetics have no alternative to purchasing insulin at the excessive prices, because they need it to live (¶ 430); the Manufacturers know that the prices paid by Kansas diabetics for insulin are based on their false list prices (¶¶ 50, 63, 76); and Kansas diabetics lack of knowledge that prices are artificially inflated. (¶ 433).

The State's complaint alleges that Kansas diabetics expect to pay the lowest fair-market price possible for the at-issue drugs. (¶ 391). *See, Motor Fuel.*, 867 F. Supp. 2d at 1140 (finding a reasonable inference that consumers expect disclosure of fuel temperature, because higher temperature fuel affords less energy and reduces the retail value of their fuel purchases).

Furthermore, there is no dispute concerning the willfulness of the Manufacturers' conduct. Kansas courts have repeatedly held that an act or omission is willful if a person "performed [it] with a designed purpose or intent … to do wrong or to cause injury to another." *Unruh v. Purina Mills, LLC*, 221 P.3d 1130, 1139 (Kan. 2009) (finding willfulness where the defendant knew that its product was causing harm but took no action to rectify it). *Elder v. Reliance Worldwide Corp.*, 563 F. Supp. 3d 1221, 1248 (N.D. Ga. 2021). In *Schoenbaum*, the court dismissed KCPA claims because the plaintiff failed to allege that defendants made "any oral or written misrepresentation with respect to the pricing of the [at-issue product]." *Id*. Unlike in *Schoenbaum*, the State alleges

that throughout the relevant time period the Manufacturers published their false and deceptive prices through Kansas. (¶¶ 13, 20, 22, 50, 63, 76, 260, 392)

C. **Plaintiff states a claim for Unconscionability.**

K.S.A. § 50-627(a) prohibits suppliers from engaging in any unconscionable act or practice "in connection with" a consumer transaction, regardless of whether the act or practice "occurs before, during or after the transaction." Unconscionability involves over-reaching—conduct which requires a consumer to assume risks which materially exceed the benefits to him of a related consumer transaction. *ConfiMed.com,* 38 P.3d at 711. "A practice is…unfair [or, in Kansas legal parlance, unconscionable] when the consumer is forced to bear a larger risk than an efficient market would require." *American Fin. Serv. Ass'n v. FTC,* 767 F.2d 957, 979 n. 27 (D.C. Cir. 1985).

K.S.A. § 50-627(b) sets forth a non-exhaustive list of circumstances which the Court must consider to determine whether an act or practice is unconscionable. The Kansas legislature intended these statutory examples be a guide in determining what kind of conduct should be unconscionable, without expressly limiting courts to the statutory examples. *Willman v. Ewen*, 627 P.2d 1190, 1192 (Kan. App. 1981). Some of the statutory circumstances clearly apply, such as taking advantage of the consumer's physical infirmity (*i.e.*, diabetes, which gives the consumer no choice but to purchase insulin at excessive prices); the gross disparity of price between what Kansas consumers and federally-insured Kansas consumers, Canadians, and Europeans pay for insulin[19] (¶¶ 227-228, 419-420); and the lack of any material benefit to the consumer for that

---

[19] The Manufacturers, of course, seek to limit any price comparisons to the market they monopolize, and argue that Canadians, Europeans and federally-insured Kansans are not "similar" consumers. In other words, they posit that the entire industry and all consumers in the market are subject to their list prices. Their position is reminiscent of the argument of the hospital, which saddled its patient with overcharges, in *Via Christi Regional Med. Center, Inc. v. Reed,* 314 P.3d 852, 868 (Kan. 2013). The Kansas Supreme Court

amount of the purchase price which exceeds the actual, non-inflated price. K.S.A. § 50-627(b)(1-3).

An additional factor which the Court may consider is the disparity between the Manufacturers' costs of production and the excessive list prices. *State ex rel. Stovall v. DVM Enter., Inc.*, 62 P.3d 653, 658 (Kan. 2003). The complaint clearly alleges such disparity—insulins which cost $2 to produce and sold for $20 in the 1990s are now priced between $300 to $700 per drug. (¶ 14). The Manufacturers have increased list prices of some insulins up to 1000% over the last decade, while their costs to produce the same decreased over the same time period. (¶¶ 15, 226).

At least with respect to unconscionable contracts, Kansas case law suggests that there must be some element of deceptive bargaining conduct as well as unequal bargaining power between the parties. *ConfiMed.com*, 38 P.3d at 713. To the extent those requirements apply to this action, they are met. As cited above, numerous courts have held that reporting and publishing artificially-inflated and false list prices is a fraudulent and deceptive practice. The unequal bargaining power is found in (1) the Manufacturers' dominance and control of insulin production in Kansas and the United States (¶¶ 5, 219); (2) the fact that insulin prices are not determined by legitimate market forces, such as costs of production, research and development, or supply and demand (¶¶ 13, 17, 225-226, 349); and (3) Kansas consumers' lack of choice or alternative to purchasing insulin, even at astronomical prices. (¶¶ 1–4). *See, U-Needa Self Storage*, 96 P.3d at 672 (finding unequal bargaining power where plaintiffs had $7000 worth of personal property stored in their vehicles

---

rejected the hospital's "everybody does it" (*i.e.,* overbilling) rationale, concluding that while "inaccurate and therefore misleading billing may be common or even uniform" it is "not dispositive." *Id.* "Industry practice alone should not be a complete defense," since "[t]he proper price for nonexistent property or services is zero." *Id.* at 868. *See also, Motor Fuel*, 867 F. Supp. 2d at 1129 (for purposes of KCPA analysis, the court compared fuel temperature disclosure practices in Kansas with those in Canada, where fuel temperatures are regulated and disclosed).

and "were greatly in need of a storage unit"). It is unconscionable, if not reprehensible, to continually and falsely inflate the price of a life-saving medication, and impose the inflated prices on consumers who lack the ability to refuse the transaction.

Accordingly, Kansas courts have found that allegations of excessive or artificially-inflated prices state unconscionability claims under the KCPA. *See, Transmasters Towing*, 168 P.3d at 64 (holding that State's unconscionability claim against towing company for excessive pricing not federally preempted); *Luttrell v. Brannon*, 2018 WL 3032993, at *14 (D. Kan. Jun. 19, 2018) (recognizing that plaintiff's only viable KCPA claim against physician is one for "unconscionable billing or pricing"); *Via Christi*, 314 P.3d at 868 (plaintiff's allegations of overcharges and duplicate charges stated a claim for unconscionability); *Louisburg Bldg. & Dev. Co., LLC v. Albright*, 252 P.3d 597, 626 (Kan. App. 2011) (contractor's failure to notify homeowners of construction cost overruns was unconscionable under KCPA); and *Nieberding*, 302 F.R.D. at 616 (certifying class on basis of KCPA unconscionability, where plaintiff alleged that price paid for defective product "grossly exceeded its worth").

**D.      Plaintiff's Claims are within the Scope of the KCPA.**

To be certain, the State's complaint does not allege price-fixing pertinent to the at-issue drugs nor does it assert an antitrust cause of action. Rather, the complaint pleads facts and allegations relevant the State's KCPA and common-law claims, *e.g.,* artificial price inflation, deception, unequal bargaining power, conspiracy, etc. *Luttrell*, 2018 WL 3032993, at *15 (recognizing that civil conspiracy claim may be premised on underlying KCPA claim); *In re Motor Fuel Temperature Sales Practices Litig.*, 534 F. Supp. 2d 1214, 1236 (D. Kan. 2008) (plaintiffs sufficiently alleged underlying wrongs, including KCPA violation, to support civil conspiracy claim). Although the complaint does not allege price-fixing, acts and practices which may have the effect of fixing prices are not necessarily outside of the scope of the KCPA.

Primarily, the Manufacturers rely on a decision of the Eastern District of Missouri in *Schoenbaum*, 517 F. Supp. 2d at 1152. The court in *Schoenbaum* cited *Equitable Life Leasing Corp. v. Abbick*, 757 P.2d 304, 307 (Kan. 1988) for the notion that acts relating to agreements, monopolies, trusts, conspiracies or combinations "in restraint of trade" do not fall within the practices prohibited by the KCPA. *Schoenbaum*, 517 F. Supp. 2d at 1152. Yet, the Kansas Supreme Court's decision in *Equitable* did not involve any antitrust or price-fixing claims or allegations— the plaintiff in *Equitable* brought claims for breach of contract, fraud, and violation of the KCPA arising out of his purchase of an office computer that did not live up to the seller's representations. *Equitable,* 757 P.2d at 305.

Attempting to reverse a jury award of civil penalties and punitive damages, the seller in *Equitable* argued that civil penalties are akin to treble damages, which are punitive in nature, citing to a repealed Kansas statute [K.S.A. § 50-801(b)] to support his argument. The repealed statute prohibited "unlawful acts, agreements, monopolies, trusts, conspiracies or combinations in restraint of trade." Recognizing the distinction between KCPA civil penalties and treble damages under the repealed statute, the court in *Equitable* noted that "[t]he [repealed] statute is clearly meant as a protection against restraint of trade, and does not include the practices prohibited by the KCPA." *Id.* Even taking this dicta at face value, it does not declare that excessive prices, or conspiracies to artificially inflate prices, lie outside of the scope of the KCPA, and respectfully, the *Schoenbaum* court gave the dicta in *Equitable,* a decision that has nothing to do with price-fixing, more significance than it deserves.[20]

---

[20] For the same reason, the Manufacturers' citations to the cases of *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 584 (M.D. Penn. 2009); *In re Photochromic Lens Antitrust Litig.*, 2011 WL 13141933, at *7 (M.D. Fla. Oct. 26, 2011); and *In re Zetia Antitrust Litig.*, 2019 WL 1297228, at *31 (E.D. Va. Feb. 2, 2019) should be disregarded. Each of these decisions, without additional analysis, merely cite to *Schoenbaum* and/or *Equitable* for the erroneous contention that anti-competitive behaviors are not within the scope of the KCPA.

That the Manufacturers may mistake the State's claims as allegations of price-fixing may be, in some part, attributable to the synergy between anti-trust enactments and the Federal Trade Commission Act, on which the KCPA is modeled. "The [u]nfair methods of competition which are condemned by [the FTCA], are not confined to those that were illegal at common law or that were condemned by the Sherman Act … the Federal Trade Commission Act was designed to supplement and bolster the Sherman Act and the Clayton Act—to stop in their incipiency acts and practices which, when full blown, would violate those Acts, as well as to condemn as unfair method[s] of competition existing violations of them." *FTC v. Motion Picture Advert. Serv. Co.,* 344 U.S. 392, 395 (1953) (emphasis added).

Indeed, this Court has recognized that the same factual allegations may support claims for relief under both antitrust and consumer protection law. *In re Universal Serv. Fund Tel. Billing Prac. Litig.,* 300 F. Supp. 2d 1107 (D. Kan. 2003). The *Universal Serv. Fund* decision was rendered in multidistrict litigation ("MDL") against AT&T, Sprint, and MCI Worldcom, which were charged with overbilling customers to recoup amounts that the carriers were federally-required to contribute to a Universal Service Fund ("USF") that subsidized low-income and rural customers. *Id.* at 1113. All plaintiffs in the MDL filed a "consolidated" second amended complaint which asserted "an antitrust claim under the Sherman Act [and] the Clayton Act" against all defendants, "a claim against Sprint under the Kansas Consumer Protection Act," and other causes of action. *Id.* at 1114. The Court denied the carriers' motions to dismiss, finding that plaintiffs alleged sufficient facts to state anti-trust claims against all defendants and the KCPA claim against Sprint. *Id.* at 1149-1150.

## III. The Manufacturers' Legal Defenses Are Unavailing.

### A. Medicare Payment Methodology is Immaterial and Irrelevant to the State's Claims.

The Manufacturers devote significant discussion to a definition of "wholesale acquisition cost" ("WAC") set forth in a Medicare payment methodology statute, 42 U.S.C. § 1395w-3a(c)(6)(B). This statute, hereinafter referred to as the "Medicare WAC methodology," provides, in pertinent part:

> The term "wholesale acquisition cost" means, with respect to a drug or biological, the manufacturer's list price for the drug or biological **to wholesalers or direct purchasers in the United States**, not including prompt pay or other discounts, rebates or reductions in price, . . . (emphasis added).

The Manufacturers contend that the State cannot sustain its KCPA claims because they "exclude" rebates from their reported list prices pursuant to the Medicare WAC methodology. (Dkt. 83 at 7). First, the Medicare WAC methodology is not legally or factually relevant to the State's claims. Second, this argument is premised on the erroneous belief that the State is required to prove that the Manufacturers violated laws extraneous to the KCPA. Third, even if the Medicare WAC methodology applies, the Manufacturers fail to exclude rebates from their list prices and are not in compliance with the statute.

First, the Medicare WAC methodology is not legally relevant here. The statute only applies to how prices are reported for the federal Medicare program and the State is not seeking recovery based how the Manufacturers report prices to the Medicare program. Every court that has addressed this question involving insulin related claims have rejected the Manufacturers' argument. *See Minnesota*, 2020 WL 2394155 at *14 (state statute having the same language as the Medicare WAC methodology was irrelevant to the deceptiveness of non-Medicare pricing representations); *Harris Cnty.*, 2020 WL 5803483 at *6 ("[H]ow the United States chooses to pay for [Medicare] reimbursed drugs" under the statute is "irrelevant to the deceptiveness of

[the] non-[Medicare] pricing representations at issue."); *City of Miami*, 2022 WL 198028, at *8, n. 8 ("[T]he City's claim is that the Manufacturer[s] inflated the price of insulin and other medications through the use of fraudulent rebates that served as kickbacks to the PBM Defendants. The Manufacturer[s] cannot use [the Medicare WAC methodology] to avoid the City's allegations of wrongdoing.").

Additionally, the Manufacturers cite no authority for their argument that the State's KCPA claim is dependent on their violation of the Medicare WAC methodology or some other law. Even defendants who are in compliance with law may be subject to KCPA liability. In *Via Christi Reg. Med. Center*, the hospital asserted its lien against an accident victim's settlement pursuant to a Kansas statute which gave it that right. *Via Christi*, 314 P.3d at 861. Still, because the lien was filled with overcharges and duplicate charges, the court rejected the hospital's argument that actions taken pursuant to a statute could not be unconscionable as a matter of law. *Id.* at 867 ("It is legally possible for a hospital in Via Christi's position to violate the KCPA's prohibition on unconscionable acts or practices by filing or pursuing enforcement of a lien."). *See also*, *Motor Fuel*, 867 F. Supp. 2d at 1137 ("even if Kansas law authorizes defendants to sell fuel without disclosing or adjusting for temperature, compliance with the regulations is not by itself enough to shield defendants from liability under the KCPA."). The court in *Motor Fuel* found that the plaintiffs stated claims for unconscionability and deception, despite testimony from the Kansas regulatory body in charge that it was legal in Kansas to sell fuel without temperature disclosures. *Id.*

As to factual relevancy, a methodology that only concerns "rebates" fails to address the breadth of the State's Insulin Pricing Scheme allegations. The complaint avers that "the entire insulin pricing structure created by the Defendants—from the false prices to the Manufacturers'

misrepresentations related to the reason behind the price, to the inclusion of the false prices in payor contracts, to the non-transparent Manufacturer Payments, to the misuse of formularies, to the PBMs' representations that they work to lower prices and promote the health of diabetics—is unconscionable and deceptive." (¶ 431). Further, the term "rebates" as used in the Medicare WAC methodology is too narrow to encompass the variety of Manufacturer Payments that the Defendants have devised to characterize remuneration.[21]

In addition to being irrelevant, the Manufacturers misconstrue the Medicare WAC methodology, resulting in their noncompliance with the same. Any statute, including 42 U.S.C. § 1395w(c)(6)(B), must be read in context and as a whole. "Even when the language of a statute is clear, [courts] must still consider various provisions of an act *in pari materia* to reconcile and bring those provisions into workable harmony, if possible." *Roe v. Phillips Cnty. Hosp.*, 522 P.2d 277, 280 (Kan. 2023). "To determine a statute's plain meaning, [courts] not only look to the language itself, but also the specific context in which that language is used . . .." *Bruce v. Kelly*, 514 P.3d 1007, 1012 (Kan. 2022) (quoting *Othi v. Holder*, 734 F.3d 259, 265 (4th Cir. 2013)). These basic tenets of statutory construction indicate that the Medicare WAC methodology does not apply to Manufacturer Payments made to PBMs.

The Manufacturers admit they sell medications to wholesalers, and sometimes pharmacies, as direct purchasers—not to PBMs. Dkt. 83 at 8. The Medicare WAC methodology, 42 U.S.C. § 1395w-3a(c)(6)(B), applies in the context of sales "to wholesalers or direct purchasers," not to the PBMs which are third-party strangers to those direct purchase transactions. Any other reading of the statute would render the words "wholesalers or other direct purchasers" superfluous.

---

[21] As defined in the complaint, "Manufacturer Payments" are "all payments or financial benefits of any kind conferred by the Manufacturer[s] [to the] PBM[s] … includ[ing] rebates, administrative fees, inflation fees, pharmacy supplemental discounts, volume discounts, price or margin guarantees, price concessions, indirect purchase fees and rebates, and any other form of consideration exchanged. (¶ 20 n. 2).

This point underscores the State's claim—the Manufacturer Payments in issue are not point-of-sale discounts or price reductions to the type of direct purchasers the Medicare WAC methodology envisions. Rather, the Manufacturer Payments involved in the Insulin Pricins Scheme are undisclosed amounts which the Manufacturers pay to PBMs to secure formulary access. The Manufacturers do not "exclude" these Manufacturer Payments from their list prices; to the contrary, the Manufacturers include these amounts in their list prices as a means to artificially inflate the same.[22] Thus, even though the Medicare WAC methodology is not relevant to the State's claims, the statute provides no support for the Manufacturers' position that they complied with the statute or that it shields them from KCPA liability.

**B.     The complaint states a claim for Unjust Enrichment.**

To state a claim for unjust enrichment under Kansas law, plaintiffs must allege (1) a benefit which they conferred upon the defendants; (2) defendants' appreciation or knowledge of the benefit; and (3) defendants' acceptance or retention of the benefit under circumstances which make it inequitable for defendants to retain the benefit without payment of its value. *J.W. Thompson Co. v. Welles Prods. Corp.*, 758 P.2d 738, 744 (Kan. 1988). Further, it is immaterial that Kansas diabetics do not contract directly with the Manufacturers or directly confer benefits upon the Manufacturers. *Gonzalez*, 489 F. Supp. 2d at 1249. A claim for unjust enrichment under Kansas

---

[22] The most recent rulemaking by the U.S. Dept. of Health and Human Services indicates that only point-of-sale rebates granted to direct purchasers will be within the safe harbor of the federal Anti-Kickback statute and recognizes that post-transaction rebates, such as those which the Manufacturers pay to the PBMs, "may create a perverse incentive that rewards manufacturers for increasing their list price, while subjecting consumers to higher out-of-pocket costs." *See*, *Fraud and Abuse; Removal of Safe Harbor Protection for Rebates Involving Prescription Pharmaceuticals*, 85 Fed. Reg. 76666, 76667 (Nov. 30, 2020).

law does not depend on privity, and hence, benefits may be conferred indirectly.[23] *Id.*; *Has-Mat Response Inc. v. Certified Waste Servs. Ltd.*, 910 P.2d 839, 847 (Kan. 1996).

The State has alleged facts which establish the essential elements of unjust enrichment. The Manufacturers received billions of dollars in revenue from sale of the at-issue drugs (¶ 51 as to Eli Lilly, ¶ 64 as to Sanofi, ¶ 77 as to Novo Nordisk, ¶ 434); the Manufacturers knew that consumers relied on the list prices they reported in purchasing the drugs (¶¶ 50, 63, 76); the Manufacturers retained revenue generated by sales to consumers despite their engagement in unconscionable and deceptive trade practices which artificially inflated their list prices, and these circumstances caused Kansas diabetics to overpay by millions of dollars. (¶¶ 29, 475-477).

Contrary to the Manufacturers' contention, the complaint does not allege that the Manufacturers only maintained their net-prices by engagement in the Insulin Pricing Scheme. The Insulin Pricing Scheme created enormous profits for all Defendants, including the Manufacturers (¶ 328), and the complaint cites studies, including the 2021 Senate Insulin Report, which demonstrate that the Insulin Pricing Scheme allowed the Manufacturers to retain more revenue from sales than they did in the early 2000s. (¶¶ 348-349). Over the same period, the Manufacturers spent only a fraction of this revenue on research and development costs for their insulin and diabetes medications. (¶¶ 226, 231, 400). Not only did the Manufacturers maintain their net prices by engaging in the Insulin Pricing Scheme (¶ 317), they immensely profited.

## C. The complaint states a claim for Civil Conspiracy

The State's complaint alleges that the Manufacturers and PBMs coordinated their efforts and "agreed to and participated in" the Insulin Pricing Scheme" (¶¶ 328, 485), and plausibly asserts

---

[23] This point of Kansas law distinguishes *City of Miami*, 2022 WL 198028, at *9 and the Manufacturers' reliance thereon. Under Florida law, a plaintiff must "directly confer" a benefit on the defendant to state a claim for unjust enrichment. *Id.* The court in *City of Miami* dismissed the unjust enrichment claim on that ground. *Id.*

a claim for civil conspiracy against the Defendants. (¶¶ 482-487). The facts in support thereof, alleged by the State, describe a course of conduct which plausibly suggests, if not establishes, the existence of a conspiratorial agreement.

Under Kansas law, the elements of civil conspiracy are (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds in the object or course of action; (4) one or more unlawful overt acts; and (5) damages as a proximate result thereof. *State ex rel. Mays v. Ridenhour*, 811 P.2d 1220, 1226 (Kan. 1991). For a civil conspiracy claim to be actionable, Kansas law requires the commission of some wrong giving rise to a cause of action independent of the conspiracy. *NVLCC, LLC v. NV Lenexa Land Holdings*, *LLC*, 519 P.3d 1236, at *4 (Kan. App. 2022).

Here, the State appropriately anchors its civil conspiracy claim on the underlying KCPA violations and the doctrine of unjust enrichment. *Luttrell*, 2018 WL 3032993, at *15 (civil conspiracy claim may be premised on KCPA violation).

*Twombly*'s plausibility requirement does not hold the State to a probability standard in pleading conspiracy; the State must only allege enough to raise a reasonable expectation that discovery will reveal evidence of an illegal agreement. *Twombly*, 550 U.S. at 556; *Anderson News, LLC v. Am. Media Inc.*, 680 F.3d 162, 184-85 (2d Cir. 2012) (plaintiff need not show that its conspiracy allegations are more likely than not true). Because direct evidence of the existence of an agreement is rare, it is possible to infer the existence of an agreement from consciously parallel conduct if the parallelism is accompanied by substantial additional evidence, often referred to as the "plus factors." *Universal Serv. Fund*, 300 F. Supp. 2d at 1146.

There is no exhaustive list of plus factors, but illustrative examples include a highly concentrated or dominated market; coordinated reporting of inflated prices to an index; the

occurrence of price increases despite stable production costs; a common motive to conspire; attendance and communications at trade associations; other high level interfirm communications and/or meetings; the frequency of the unlawful transactions in which the parties engaged; and evidence of an unwillingness by competitors to compete on price.[24]

A court should not parse each plus factor and view it in isolation; rather, allegations of conspiracy should be viewed as a whole. *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 425 (4th Cir. 2015). The complaint is plausible and the claims may proceed to discovery if the circumstantial factual allegations and context support the inference that a party, whose participation was essential to the conspiracy, knew of a scheme and engaged in conduct consistent with such knowledge. *Little Kids, Inc. v. 18th Ave. Toys, Ltd.*, 2020 WL 7264267, at *13 (D. R.I. Dec. 10, 2020).

The State's complaint alleges a conspiratorial agreement to participate in and effectuate the Insulin Pricing Scheme (¶ 485), that each Defendant consciously committed to the scheme and engaged in the overt acts necessary to carry it out (¶¶ 125, 328, 330-349), and that the Defendants coordinated with respect to pricing, resulting in lockstep price increases to fund Manufacturer Payments to secure formulary position. (¶¶ 248-255, 486). The State alleges that the conspiracy could not have been accomplished without the willing participation of both the Manufacturers and the PBMs. (¶ 20).

Moreover, as pled in the complaint, the context of the conspiracy plausibly suggests a preceding agreement between the Defendants. The Manufacturers control the production of insulin

---

[24] *See,* Plus factors identified in *Hanover Ins. Co. v. First Midwest Bank of Poplar Bluff*, 2021 WL 5331474, at *4 (E.D. Mo. Nov. 16, 2021); *In re Salmon,* 2021 WL 1109128, at *18 (S.D. Fla. Mar. 23, 2021); *In re Cattle Antitrust Litig.*, 2020 WL 5884676, at *6 (D. Minn. Sep. 29, 2020); *In re Tyson Foods, Inc. Sec. Litig.*, 2018 WL 1598670, at *9 (W.D. Ark. Mar. 31, 2018); *In re Pre-Filled Propane Tank Antitrust Litig.*, 860 F.3d 1059, 1069 (8th Cir. 2017); *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2nd Cir. 2013); *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 48 (1st Cir. 2013).

and source 99% of insulins sold in Kansas. (¶ 219). The insulin pricing system does not function as a normal market in which competition reduces prices (¶¶ 332, 349, 486); at least one co-conspirator, OptumRx, has admitted the "lack of meaningful competition" in a market "for a drug that is nearly 100 years old and which has seen no significant innovation in decades." (¶ 332). Plausibility is also evident in the 2021 findings of the 2021 Senate Insulin Committee, which declared that the "[M]anufacturers and [PBMs] have created a vicious cycle of price increases" in an industry that "is anything but a free market …" (¶ 349).

In addition to these undisputed facts, the complaint alleges that the Defendants share confidential and proprietary market data and information (¶ 328), with frequent and regularly arranged meetings between the Defendants' C-suite executives at trade conferences and other locations. (¶¶ 88, 127, 291, 298, 301, 486, alleging numerous meetings and communications between Defendants' executives at trade conferences). Notably, distinct increases in the prices of insulin products occurred shortly after industry conferences. (¶¶ 304-305).

Tellingly, in their testimony before Congress, the Manufacturers admitted engaging in the over acts which furthered the conspiracy alleged by the State. (¶ 336, President of Novo Nordisk describing the "perverse" and "misaligned" incentives of the insulin pricing system which "encourage[ ] keep[ing] prices high"; ¶ 337, Eli Lilly admission that it raises reported prices as *quid pro quo* for formulary placement). A conspiracy is the only rational explanation for why the price of a one-hundred-year-old drug, which lacks innovation and has not experienced any increase in the costs of production, continues to skyrocket. (¶¶ 207, 332, 388). Contextually, the allegations of the complaint paint a picture which demonstrates more than mere parallel conduct.

As other courts have held, the State's factual allegations as a whole plausibly suggest the existence of a preceding conspiratorial agreement. *See, Mississippi*, 2022 WL 3222890 at *8

(Mississippi plausibly alleged the existence of a civil conspiracy); *Harris Cnty.*, 2020 WL 5803483 at \*11 ("Harris County does not merely allege parallel conduct; it alleges that both groups of defendants engaged in a *quid pro quo* exchange of rebates for preferred formulary list placement. Harris County pleads facts that suggest a preceding agreement …"); *In re Insulin Pricing Litig.*, 2019 WL 643709, at \*7 (finding sufficiency of allegations for a RICO conspiracy, "[p]laintiffs do not merely allege parallel conduct, but rather assert facts that suggest a preceding agreement").

Price uniformity, especially if accompanied by an artificial price level not related to the supply and demand of a given commodity, may be evidence from which an agreement or understanding, or some concerted action of sellers operating to restrain commerce, may be inferred. *Triangle Conduit & Cable Co. v. FTC*, 168 F.2d 175, 179 (7th Cir. 1948) (citing *Cement Mfr.s' Prot. Ass'n v. U.S.*, 268 U.S. 588, 606 (1925)). Any combination which tampers with price structures is engaged in an illegal activity. *U.S. v. Socony-Vacuum Oil Co., Inc.*, 310 U.S. 150, 221 (1940).

Even if this Court finds that the State has failed to plausibly plead its conspiracy allegations against the Defendants, such a finding will not resolve the State's claims against the Defendants for their individual violations of the KCPA and for unjust enrichment. *Hefner v. Deutscher*, 2023 Kan. App. Unpub. LEXIS 136, at \*49-52 (Mar. 24, 2023) (plaintiff's inability to prove civil conspiracy, *i.e.*, a failure to prove one or more of its elements, does not prevent him from holding one or more of the alleged conspirators independently liable for the underlying wrongful acts).

## CONCLUSION

A party bringing a motion to dismiss under Rule 12(b)(6) bears the burden of establishing that no claim has been stated upon which relief can be granted. *Smith v. Fenner*, 1999 WL 592663, at \*1 (N.D. Tex. Aug. 6, 1999) (citing *Sherrell by and through Wooden v. Longview*, 683 F. Supp.

1108, 1110 (E.D. Tex. 1987)). The Manufacturer Defendants have failed to carry this burden, as the complaint states claims with particularity against the Defendants for violation of the Kansas Consumer Protection Act, unjust enrichment, and civil conspiracy. For this reason and others stated in this Memorandum, the State of Kansas opposes the Manufacturer Defendants' Motion to Dismiss and prays that the same be denied.

RESPECTFULLY SUBMITTED this the 24th day of April, 2023.

KRIS W. KOBACH, ATTORNEY GENERAL
STATE OF KANSAS

By:     */s/ R. Johan Conrod*
        Joanne Cicala, TX 24052632
        Josh Wackerly, TX 24093311
        Richard Johan Conrod, Jr., KS 29563
        THE CICALA LAW FIRM PLLC
        101 College Street
        Dripping Springs, Texas 78620
        Telephone: (512) 275-6550
        Fax. (512) 858-1801
        Email: joanne@cicalapllc.com
        Email: josh@cicalapllc.com
        Email: johan@cicalapllc.com

        Christopher Teters, KS Sup. Ct. #27248
        Assistant Attorney General
        Office of the Kansas Attorney General
        120 SW 10th Avenue, Second Floor
        Topeka, Kansas 66612-1507
        Tel: (785) 296-3751
        Fax: (785) 291-3699
        Email: chris.teters@ag.ks.gov

        Of Counsel:

        William Liston III, MSB 8482
        W. Lawrence Deas, MSB 100227
        LISTON & DEAS, PLLC
        605 Crescent Blvd., Suite 200
        Ridgeland, Mississippi 39157
        Telephone: (601) 981-1636
        Fax. (601) 982-0371

Email: william@listondeas.com
Email: lawrence@listondeas.com

Tanya D. Ellis, MSB 101525
Edwin S. Gault, Jr., MSB 10187
Walter G. Watkins, III, MSB 100314
FORMAN WATKINS & KRUTZ LLP
210 E. Capitol Street, Suite 2200
Jackson, Mississippi 39201-2375
Telephone: (601) 960-8600
Fax. (601) 960-8613
Email: tanya.ellis@formanwatkins.com
Email: win.gault@formanwatkins.com
Email: trey.watkins@formanwatkins.com

Matthew C. McDonald, MSB 105966
DAVID NUTT & ASSOCIATES
605 Crescent Blvd., Suite 200
Ridgeland, Mississippi 39157
Telephone: (601) 898-7302
Fax. (601) 982-0371
Email: mattm@davidnutt.com

**Certificate of Service**

I hereby certify that on April 24, 2023, the foregoing was filed via the Clerk of the Court by using the CM/ECF System, which will send a notice of electronic filing to all attorneys of record.

*/s/ R. Johan Conrod*
R. Johan Conrod