## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

THE STATE OF KANSAS, ex rel. KRIS W.
KOBACH, ATTORNEY GENERAL

     *Plaintiff,*

     v.

ELI LILLY AND COMPANY; ET AL.

     *Defendants.*

Case No. 5:23-cv-4002-EFM-RES

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO PBM DEFENDANTS' RULE 12(b)(6) MOTION TO DISMISS FAILURE FOR STATE A CLAIM

# TABLE OF CONTENTS

I.    INTRODUCTION................................................................................................ 1

II.    FACTUAL ALLEGATIONS ............................................................................. 2

III.    LEGAL STANDARD ......................................................................................... 5

     A.    Rule 12(b)(6) ............................................................................................ 5

     B.    Rule 9(b) Does Not Apply ...................................................................... 5

IV.    ARGUMENT ...................................................................................................... 6

     A.    The State Has Sufficiently Pled Its KCPA Claims ................................ 6

         i.    The PBMs Are "Suppliers" That Engaged In a "Consumer Transaction" Under the KCPA .................................................... 7

         ii.    The PBMs Have Engaged in Deceptive Acts under the KCPA............... 12

             1.    The PBMs' Misconduct Was Deceptive....................................... 12

             2.    The PBMs' Counterarguments Are Meritless.............................. 13

                 a.    The State Does Not Engage in Improper "Group Pleading"........................................................................ 13

                 b.    The PBMs' Misrepresentations Are Actionable .............. 15

                     i.    The PBMs' Misrepresentations Are More Than Puffery or Aspirational Statements...................... 15

                 c.    *Noerr-Pennington* Does Not Apply ................................. 19

                 d.    Defendants' Publishing and Utilizing False List Prices is Actionable under the KCPA ............................... 20

                 e.    The PBMs Have a Duty to Disclose ................................. 20

         iii.    The PBMs' Misconduct Is Also Unconscionable under the KCPA ......... 21

             1.    The PBMs' Misconduct Is Unconscionable ................................. 21

             2.    The PBMs have Unequal Bargaining Power ................................ 23

     B.    The State Has Properly Pled Unjust Enrichment.................................... 24

     C.    The Complaint States a Claim for Civil Conspiracy ............................. 26

D.     None of the State's Claims Are Time-Barred ........................................................ 26

E.     The State Sufficiently Pleads its Claims Against the Parent Companies ............. 27

**V.    CONCLUSION ................................................................................................................. 29**

# TABLE OF AUTHORITIES

## Cases

*Adler v. Wal-Mart Stores, Inc.*,
    144 F.3d 664 (10th Cir. 1998) ........................................................................ 19

*All Brands Distrib., LLC v. Vital Pharms., Inc.*,
    2022 WL 3646274 (D. Kan. Aug. 24, 2022) ........................................................ 25

*Alpine Bank v. Hubbell*,
    555 F.3d 1097 (10th Cir. 2009) ........................................................................ 17

*Apple Inc. Sec. Litig.*,
    2020 WL 2857397 (N.D. Cal. June 2, 2020) ........................................................ 19

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................................ 5

*Baldwin v. Priem's Pride Motel, Inc.*,
    580 P.2d 1326 (Kan. 1978) .............................................................................. 18

*Bimbo Bakeries USA, Inc. v. Sycamore*,
    29 F.4th 630 (10th Cir. 2022) .......................................................................... 17

*Bologna v. Allstate Ins. Co.*,
    138 F. Supp. 2d 310 (E.D.N.Y. 2001) ................................................................ 17

*Bonilla v. Volvo Car Corp.*,
    150 F.3d 62 (1st Cir. 1998) .............................................................................. 21

*Brave Law Firm, LLC v. Truck Accident Lawyers Grp., Inc.*,
    2019 U.S. Dist. LEXIS 79275 (D. Kan. May 10, 2019) ................................... 5, 6

*Buridi v. Idbeis*,
    2016 U.S. Dist. LEXIS 162466 (D. Kan. Nov. 22, 2016) .................................... 26

*CIT Grp./Sales Fin., Inc. v. E-Z Pay Used Cars, Inc.*,
    29 Kan. App. 2d 676 (2001) ............................................................................ 10

*Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*,
    911 F.2d 242 (9th Cir. 1990) ............................................................................ 18

*Emps.' Ret. Sys. Of Haw. v. Whole Foods Mkt., Inc.*,
    905 F.3d 892 (5th Cir. 2018) ............................................................................ 18

*Farrell v. Gen. Motors Corp.*,
    815 P.2d 538 (Kan. 1991) ................................................................................. 9

*Finstad v. Washburn Univ. of Topeka,*
845 P.2d 685 (Kan. 1993) ................................................................................. 7

*Forsyth v. Humana Inc.,*
114 F.3d 1467 (9th Cir. 1977) ......................................................................... 18

*Freedom Transp., Inc. v. Navistar Int'l Corp.,*
2020 WL 430213 (D. Kan. Jan. 28, 2020) ...................................................... 18

*Friedman v. Nationwide Ins. Co. of Am.,*
2017 U.S. Dist. LEXIS 236227 (C.D. Cal. Feb. 9, 2017) ................................ 17

*FTC v. Affiliate Strategies, Inc.,*
2010 U.S. Dist. LEXIS 150661 (D. Kan. June 4, 2010) .................................... 6

*Geico Indem. Ins. Co. v. Kannaday,*
2007 WL 2990552 (D. Kan. Oct. 11, 2007) .................................................... 23

*Gonzalez v. Pepsico, Inc.,*
489 F. Supp. 2d 1233 (D. Kan. 2007) ............................................................... 6

*Gov't of Puerto Rico v. Carpenter Co.,*
442 F. Supp. 3d 464 (D.P.R. 2020) ................................................................. 25

*Grossman v. Novell, Inc.,*
120 F.3d 1112 (10th Cir. 1997) ...................................................................... 18

*Holman v. Fifth Third Bank, N.A.,*
2021 U.S. Dist. LEXIS 228480 (D. Kan. Nov. 30, 2021) ............................ 7, 11

*In re Auto. Parts Antitrust Litig.,*
No. 13-cv-2005, 2021 U.S. Dist. LEXIS 8201 (E.D. Mich. Jan. 15, 2021) ......... 26

*In re Chocolate Confectionary Antitrust Litig.,*
602 F. Supp. 2d 538 (M.D. Pa. 2009) ............................................................. 24

*In re Direct Purchaser Insulin Pricing Litig.,*
2021 WL 28862165 (D.N.J. July 9, 2021) ........................................... 13, 18, 19

*In re EpiPen Direct Purchaser Litig.,*
2021 WL 147166 (D. Minn. Jan. 15, 2021) ......................................... 13, 18, 19

*In re Graphic Processing Units Antitrust Litig.,*
527 F. Supp. 2d 1011 (N.D. Cal. 2007) .......................................................... 24

*In re Packaged Seafood Prods. Antitrust Litig.,*
338 F. Supp. 3d 1079 (S.D. Cal. 2018) ........................................................... 25

*In re. Int'l Harvester* Co.,
104 F.T.C. 949 (1984) ................................................................. 15

*Ind. Pub. Ret. Sys. v. Pluralsight, Inc.*,
45 F.4th 1236 (10th Cir. 2022) .................................................... 18

*Katzman v. Victoria's Secret Catalogue,*
167 F.R.D. 649 (S.D.N.Y. 1996) ................................................. 21

*Kelly v. VinZant,*
197 P.3d 803 (Kan. 2008) ............................................................ 12

*Kiger ex rel. Qualcomm Inc. v. Mollenkopf,*
2021 WL 5299581 (D. Del. Nov. 15, 2021) ............................... 18

Koch v. Koch Industries, Inc.,
203 F.3d 1202 (10th Cir. 2000) ...................................................... 6

*Langford v. Rite Aid of Ala., Inc.*,
231 F.3d 1308 (11th Cir. 2000) .................................................... 21

*Lynd v. Brickie,*
1990 U.S. Dist. LEXIS 16509 (D. Kan. Nov. 21, 1990) ...................... 8, 10, 11, 23

*Manley v. Wichita Business College,*
701 P.2d 893 (Kan. 1985) ............................................................ 12

*Marksberry v. FCA US LLC,*
606 F. Supp. 3d 1075 (D. Kan. June 9, 2022) (Melgren, J.) ........ 21

*Midland Pizza, LLC v. Southwestern Bell Tel. Co.*,
2010 U.S. Dist. LEXIS 118855 (D. Kan. Nov. 5, 2010) .............. 12

*Mississippi ex rel. Fitch v. Lilly,*
2022 U.S. Dist. LEXIS 236485 (S.D. Miss. Aug. 29, 2022) ............. passim

*Moody v. Ocwen Loan Servicing, LLC,*
2016 WL 8814352 (C.D. Cal. Feb. 22, 2016) ............................. 17

*Moore v. Bird Eng'g Co., P.A.,*
273 Kan. 2 (Kan. 2002) ............................................................... 12

*Mulder v. Kohl's Dep't Stores, Inc.*,
865 F.3d 17 (1st Cir. 2017) ......................................................... 18

*Navient Sols. LLC v. Law Offices of Jeffrey Lohman,*
2020 WL 1867939 (E.D. Va. Apr. 14, 2020) .............................. 19

*Nieberding v. Barrette Outdoor Living, Inc.*,
302 F.R.D. 600 (D. Kan. 2014)............................................................................................ 20

*Ormsby v. Imhoff & Assocs., P.C.*,
2014 WL 4248264 (D. Kan. Aug. 27, 2014) ........................................................................ 18

*Rosenzweig v. Azurix Corp.*,
332 F.3d 854 (5th Cir. 2003) ............................................................................................... 18

*Satsky v. Paramount Commc'ns, Inc.*,
7 F.3d 1464 (10th Cir. 1993) ............................................................................................... 25

*Schiro v. Cemex, S.A.B. de C.V.*,
396 F. Supp. 3d 283 (S.D.N.Y. 2019).................................................................................. 18

*Schoenbaum v. E.I. Dupont De Nemours & Co.*,
517 F. Supp. 2d 1125 ........................................................................................................... 24

*Shigo v. Clark*,
2022 WL 2966320 (D. Kan. July 27, 2022) ........................................................................ 23

*Sierra Club v. Two Elk Generation Partners, Ltd. P'ship*,
646 F.3d 1258 (10th Cir. 2011) ........................................................................................... 25

*SMD Invs. Ltd. v. Raytheon Aircraft Co.*,
2006 WL 580968 (D. Kan. Mar. 8, 2006) ........................................................................... 23

*State ex rel. Mays v. Ridenhour*,
248 Kan. 919 (Kan. 1991).................................................................................................... 10

*State ex rel. Stephan v. Brotherhood Bank & Trust Co.*,
8 Kan. App. 2d 57 (1982) .......................................................................................... 5, 6, 27

*State ex rel. Sullivan v. Lujan*,
969 F.2d 877 (10th Cir. 1992) ............................................................................................. 25

*Tomlinson v. Ocwen Loan Servicing, LLC*,
2015 U.S. Dist. LEXIS 162193 (D. Kan.  Dec. 3, 2015) (Melgren, J) ............................... 23

*United States v. Bestfoods*,
524 U.S. 51 (1998)................................................................................................................ 27

*Via Christi Reg'l Med. Ctr., Inc. v. Reed*,
298 Kan. 503 (2013) ...................................................................................................... 21, 23

*Wasatch Transp., Inc. v. Forest River, Inc.*,
53 F.4th 577 (10th Cir. 2022) .............................................................................................. 18

*Waugh Chapel S., LLC v. United Food & Com. Workers Union Loc. 27*,
   728 F.3d 354 (4th Cir. 2013) ................................................................. 19

*Weckhorst v. Kan. State Univ.*,
   241 F. Supp. 3d 1154 (D. Kan. 2017) .................................................... 14

*Wichita Fed. Sav. & Loan Ass'n v. Landmark Grp.*,
   657 F. Supp. 1182 (D. Kan. 1987) ......................................................... 14

*Williamson v. Amrani*,
   152 P.3d 60 (Kan. 2007) ......................................................................... 21

*Wright v. Enhanced Recovery Co. LLC*,
   227 F. Supp. 3d 1207 (D. Kan. 2016) .................................................... 10

**Statutes**

K.S.A. § 50-623 .............................................................................................. 6

K.S.A. § 50-624 ......................................................................................... 8, 11

K.S.A. § 50-626 ................................................................................... 12, 13, 20

K.S.A. § 50-627 ....................................................................................... 21, 22

K.S.A. § 50-632 .............................................................................................. 25

**Rules**

FED R. CIV. P. 8 .............................................................................................. 6

FED. R. CIV. P. 12(b)(6) ................................................................................... 5

FED. R. CIV. P. 15 .......................................................................................... 29

FED. R. CIV. P. 9(b) .............................................................................. 6, 13, 14

# I.    INTRODUCTION

The Insulin Pricing Scheme has had a direct and devastating impact on Kansas diabetics. As a result of Defendants' Scheme, insulin—a drug that was first introduced one-hundred years ago, a drug that tens of thousands of Kansas diabetics need to stay alive, and a drug that could be profitably priced at under $2—now costs over $400. (¶¶ 207, 398).[1] The precipitous insulin price increases have caused dire health and financial consequences for Kansas diabetics. (¶¶ 28–33, 434–442).

The State filed suit in Kansas state court under the Kansas Consumer Protection Act ("KCPA") to end Defendants' misconduct and to recover the overpayments made by Kansas diabetics. The State alleges that both sets of Defendants—the Manufacturers[2] ("Manufacturers" or "Manufacturer Defendants") and the PBMs[3] ("PBMs" or "PBM Defendants")—are independently and jointly liable for unconscionable and deceptive practices that gave rise to these harms.

In their 12(b)(6) Motion to Dismiss, the PBMs attempt to sidestep any responsibility for the egregious insulin price increases. The PBMs' Motion, however, is flawed in several key respects. The Motion attempts to reduce all of the alleged PBM misconduct—hiding/obfuscating manufacturer payments, excluding lower-priced insulins from formularies, coordinating with the Manufacturers to increase the availability of higher-priced insulins, forcing diabetics into switching their insulins to the detriment of their health, intentionally pricing diabetics out of the insulins they need to stay alive, and lying about all of it—to a case simply about whether the

---

[1] References to (¶) refer to paragraphs in the Petition (Dkt. 1, Ex. A), referred to herein as the "complaint."

[2] Manufacturer Defendants are Eli Lilly and Company ("Eli Lilly"), Sanofi-Aventis U.S. LLC ("Sanofi"), and Novo Nordisk Inc. ("Novo Nordisk"). The complaint identifies the at-issue drugs in Table 1.

[3] PBM Defendants are (a) Evernorth Health Inc., Express Scripts Inc., Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy Inc., and Medco Health Solutions Inc., collectively "Express Scripts"; (b) CVS Health Corporation, CVS Pharmacy, Inc., Caremark Rx LLC, CaremarkPCS Health LLC, and Caremark LLC, collectively "CVS Caremark"; and (c) OptumRx Inc., "OptumRx."

rebates that the Manufacturers pay to the PBMs are legal or not. This argument is disingenuous and disallowed at the pleading stage.

The Motion also asserts arguments that have been rejected by several federal courts that have considered insulin-related claims, including a recent opinion in a case brought by the Mississippi Attorney General against these same PBMs. *See, e.g., Mississippi ex rel. Fitch v. Lilly*, 2022 U.S. Dist. LEXIS 236485, at *14 (S.D. Miss. Aug. 29, 2022). It disregards relevant Kansas holdings. And it incongruously—and incorrectly—argues for a heightened pleading standard for all of the State's claims and then ignores dozens of allegations that plead misrepresentations with the particularity that the PBMs assert is lacking.

Taking all the complaint's allegations as true and construing them in favor of the State, respectfully, the PBM's Motion should be denied.

## II.    FACTUAL ALLEGATIONS

There are two sets of actors responsible for the Insulin Pricing Scheme: the three drug Manufacturer Defendants who control 99% of the diabetic drug market (¶¶ 5, 219) and the three PBM Defendants who control the terms of over 270 million Americans' pharmacy benefits and operate among the largest retail and mail order pharmacies in the country (including in Kansas). (¶¶ 6, 286–287). These Defendants control the price that nearly every diabetic and payor pays for the diabetic treatments at issue in this case. (¶¶ 27, 430).

Each Defendant, individually and in concert, has caused the prices of the at-issue drugs to artificially inflate in order to generate profits at the expense of Kansas diabetics. (¶¶ 19–26, 328, 401–402, and Figs. 1-11 at ¶¶16, 241–254). As a direct result of the PBMs' conduct, the list prices for these diabetic drugs have become so inflated and untethered from the actual prices paid to the Manufacturers as to constitute false prices. (¶¶ 21, 323, 392). The PBMs then insist that these

prices be used as the basis for all payments they make and receive and, in doing so, ensure that the price inflation harms diabetics. (¶¶ 22, 50–52, 63-65, 76–78, 114, 164, 185, 324, 394–396, 403).

Millions of diabetic Kansas residents rely on the at-issue drugs for health and even survival. (¶¶ 4, 437-442). Given the degree of price inflation caused by Defendants' misconduct, many diabetics have been forced to extreme measures: rationing or underdosing their insulin, injecting expired insulin, or even starving themselves to control their blood sugars. (¶¶ 30, 438). Indeed, notwithstanding their general inclination to blame each other, the Manufacturers and PBM Defendants do at least agree on one key fact: the current price of insulin is unjustifiably high and denies diabetics access to these essential drugs. (¶¶ 331–332). The financial harm is likewise undeniable. Nearly every diabetic and payor has been directly harmed because their payments are based on the inflated list prices generated by Defendants' misconduct. (¶¶ 22, 27-29, 434-442).

Each PBM Defendant is responsible for ensuring these harms occur. More specifically, each PBM develops standard formularies that establish which diabetes medications are paid for by insurance and which are not. (¶¶ 7–9, 311–314). Given their market dominance, each PBM wields enormous control over the at-issue drug sales, as their formularies drive utilization of diabetic drugs. (¶¶ 6–11, 285-289, 311–314, 430). No drug is dispensed unless it is paid for, and the PBM Defendant formularies are the keys to such payment. (¶¶ 7, 10–11, 313–314).

Cognizant of this fact—and cognizant that PBMs make more money from higher prices—the Manufacturer Defendants intentionally raise their prices and then pay significant sums back to the PBMs in the form of rebates, administrative fees, and other consideration ("Manufacturer Payments") to ensure favorable placement of their diabetes drugs on PBM formularies. (¶¶ 19-23, 313-320, 350). The PBMs, in turn, grant preferred formulary status to the drugs with the highest list price and largest Manufacturer Payments and, in turn, exclude lower-priced, more affordable

insulins from their formularies. (¶¶ 22, 321). The PBMs also hide, obfuscate, and launder these payments through their affiliated entities in order to keep a large percentage of these payments (¶¶ 352, 354–375, 423–428). The PBMs further engage in a practice known as "non-medical switching"—changing which insulins they make available on their formularies in order to generate additional profits—to the detriment of diabetics' health. (¶¶ 439–440). Both the Manufacturers and PBMs then work together to promote the highest-priced diabetic drugs to patients, pharmacies and prescribing physicians because they are the most profitable to Defendants, further increasing utilization of the very drugs they have caused to be so unnecessarily expensive. (¶ 328).

Each PBM Defendant is driving up the prices for the at-issue drugs because they profit in numerous ways from the inflated prices. (¶¶ 24, 353–388). The PBMs ensure that the inflated prices also serve as the basis for the prices paid by payors and diabetics. (¶¶ 403–404). Through mail-order and retail pharmacies, each of the PBMs utilize the inflated list prices to set the out-of-pocket amounts that Kansas diabetics pay to obtain their diabetes medications. (¶¶ 93, 116, 168, 188, 264–265, 276, 384, 395).

And, critically, each PBM Defendant obscures these truths. Indeed, each PBM holds itself out as doing the exact opposite of what the State alleges—each PBM Defendant misrepresents that it (1) uses its market power and formularies to lower the prices of diabetes medications and (2) chooses drugs for formulary placement that promote the health of diabetics. (¶ 83–85, 129, 325, 329, 342–343, 388, 406–416, 421, 431). Each PBM has made these misrepresentations to the public, to diabetics, to Wall Street, to Congress and directly to the State. *Id*. Each PBM representation is false. (¶¶ 409–410, 417-423). Even in their moving brief, the PBMs endeavor to maintain this fiction, arguing "PBMs play an important role in managing the out-of-pocket cost of pharmaceutical drugs for their health-plan clients. PBMs negotiate with pharmaceutical

manufacturers to obtain lower prices of prescription drugs that they can then offer their clients."
(Dkt. 85 at 2). This assertion is directly contradicted by the State's allegations.

To this day the PBMs continue to profit from and engage in the Insulin Pricing Scheme.
(¶¶ 441-442) The harm caused by the Scheme is ongoing; each time a Kansas diabetic pays the
artificially-inflated price for insulin, a new injury is sustained. *Id*.

## III. LEGAL STANDARD

### A. Rule 12(b)(6)

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted
as true, to "state a claim to relief that is plausible on its face." *Brave Law Firm, LLC v. Truck
Accident Lawyers Grp., Inc.*, 2019 U.S. Dist. LEXIS 79275, *9 (D. Kan. May 10, 2019) (Melgren,
J.) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In considering a Rule 12(b)(6) motion to
dismiss, the Court accepts as true all well-pleaded facts in the complaint and draws all reasonable
inferences from those facts in the plaintiff's favor. *Iqbal*, 556 U.S. at 678-79. To survive a Rule
12(b)(6) motion, the complaint must provide the defendant with fair notice of the basis for the
claim, and it must be facially plausible. *Id*. "A claim has facial plausibility when the plaintiff pleads
factual content that allows the court to draw the reasonable inference that the defendant is liable
for the misconduct alleged." *Id*.

### B. Rule 9(b) Does Not Apply

Under the KCPA "[t]he Attorney General is granted broad investigatory and rulemaking
authority for the purpose of protecting the public from unscrupulous suppliers and is given the
discretion to exercise these powers in a manner which will further the public interest." *State ex rel.
Stephan v. Brotherhood Bank & Trust Co*., 8 Kan. App. 2d 57, 62 (1982). Given this broad grant
of authority, courts in this District have "decline[d] to impose upon the Attorney General the
obligation of pleading 'who, what, where, and when' when he or she brings a claim to protect the

public interest." *FTC v. Affiliate Strategies, Inc.*, 2010 U.S. Dist. LEXIS 150661, *26 (D. Kan. June 4, 2010) (citing *State ex rel. Stephan*, 8 Kan. App. 2d at 62). Indeed, the PBMs fail to cite to any cases holding the State to a Rule 9(b) pleading standard when bringing claims under the KCPA. Because the State has brought this case under its authority to protect the public interest, Rule 8's plausibility standard applies. *See id*.

Even if Rule 9(b) did apply (it does not if the Court utilizes the *Brotherhood Bank* analysis), the State has pled its KCPA claims with particularity. In the Tenth Circuit, Rule 9(b) only requires a party to allege "the time, place and content of the alleged wrongful conduct, as well as the identities of the wrongdoers." *Gonzalez v. Pepsico, Inc.*, 489 F. Supp. 2d 1233, 1246 (D. Kan. 2007). The Tenth Circuit has never held that Rule 9(b) requires plaintiffs to plead "how" or "why" alleged misrepresentations are actually false. *Koch v. Koch Industries, Inc.*, 203 F.3d 1202, 1236 (10th Cir. 2000). Moreover, the requirements of Rule 9(b) are relaxed when, as is the case here, "the alleged fraudulent acts are numerous and occur over an extended time period." *Brave Law Firm*, 2019 U.S. Dist. LEXIS 79275, *17. As demonstrated throughout this Response, the State's allegations satisfy these requirements. *See, e.g., Mississippi*, 2022 U.S. Dist. LEXIS 236485, at *14 (ruling Mississippi's Insulin Pricing Scheme claims were pled with particularly).[4]

## IV.    ARGUMENT

### A.    The State Has Sufficiently Pled Its KCPA Claims

The KCPA is to be "construed liberally to . . . protect consumers from suppliers who commit deceptive and unconscionable practices." K.S.A. § 50-623. For a private consumer to bring a KCPA claim, she must "allege that she is a consumer and the defendant is a supplier under the

---

[4] Notably, the *Mississippi* Court did not apply Rule 9(b), but nonetheless found that particularity had been pled. *See Mississippi,* 2022 U.S. Dist. LEXIS 236485, at *12-14 ("[t]hough liability under the MCPA does not require a finding of fraud for an act to be unfair or deceptive . . . the Court finds that the State's allegations also survive the Rule 9(b).")

KCPA, that they were involved in a consumer transaction, that the plaintiff is aggrieved by the defendant's alleged violations, and that the defendant's actions were deceptive or unconscionable." *Holman v. Fifth Third Bank, N.A.*, 2021 U.S. Dist. LEXIS 228480, *11-12 (D. Kan. Nov. 30, 2021) (Melgren, J.). However, unlike in private actions, "[a] loss or injury resulting from a violation of the Act is not required in an action filed by the Attorney General under the [KCPA]." *Finstad v. Washburn Univ. of Topeka,* 845 P.2d 685, 691 (Kan. 1993).

Thus, for the State to plead a KCPA violation requires only demonstrating that: (1) a supplier engaged in a consumer transaction and (2) that their misconduct was deceptive or unconscionable. The State has sufficiently pled these elements.[5]

### i. The PBMs Are "Suppliers" That Engaged In a "Consumer Transaction" Under the KCPA

The KCPA defines a "consumer transaction" to include the sale and/or solicitation of a good to an individual for personal, family, or household use.[6] The "consumer transactions" at-issue here involve individual diabetics purchasing diabetes medications for personal use, including medications adjudicated through the PBMs' formularies and dispensed through the PBMs' retail and mail order pharmacies. (¶¶ 27-34, 39, 193, 434-442, 457). The PBMs do not dispute—nor could they—that these transactions constitute "consumer transactions" under the KCPA.

The PBMs are also "suppliers" in connection with these consumer transactions. The definition of "supplier" under the KCPA is "extremely broad" and includes any person who solicits

---

[5] Even if the State was required to show that a consumer was aggrieved, the complaint satisfies that requirement. (¶¶ 434-42).

[6] K.S.A. § 50-624(b) defines "consumer" to include "an individual . . . who seeks or acquires property . . . for personal, family, household . . . purposes;" K.S.A. 50-624 (c) defines "consumer transaction" to include "a sale . . . of property . . . to a consumer . . . or a solicitation by a supplier with respect [to a sale];" K.S.A. 50-624(j) defines "property" to include "goods."

or engages in any consumer transaction, "whether or not dealing directly with the consumer."[7] *Lynd v. Brickie*, 1990 U.S. Dist. LEXIS 16509, *6, (D. Kan. Nov. 21, 1990) (citing K.S.A. § 50-624 (i)). As explained by the *Lynd* court:

> [S]uppliers are not always in privity of contract with the consumer. Further, the phrase, "or other person who, in the ordinary course of business, solicits, engages in or enforces consumer transactions, whether or not dealing directly with the consumer," id., expressly negates any privity requirement because it extends the reach of the [KCPA] to third parties to the consumer transaction.

*Id*. at *6 (emphasis in original). Thus, the KCPA reaches "suppliers" that do not contract or engage directly with consumers.

Here, the PBMs cannot reasonably argue that they did not engage—both directly and indirectly—in the at-issue consumer transactions; indeed, the fact that the PBMs sell the at-issue drugs through their mail order and retail pharmacies to Kansas diabetics alone qualifies them as "suppliers" under the KCPA. (¶¶ 116-17, 168, 188). The PBMs' argument that the complaint "does not tie any [mail order or retail pharmacy activity] to the alleged consumer-protection violations" is incorrect. Dkt. 85 at 6.[8] The PBMs' pharmacies dispense the at-issue drugs to Kansas diabetics, profit from the at-issue price increases for each drug sold, and influence the manner in which the

---

[7] The KCPA defines "person" to include any "corporation . . . other legal entity." K.S.A. 50-624(i).

[8] This argument is also contradicted by Express Scripts' Notice of Removal which is premised on the fact that it "provide[s] services to members of the DoD's TRICARE health care program across the country, including in Kansas." Notice of Removal, Dkt. 1 at ¶ 1; *see also id*. at ¶ 30. These services include dispensing the at-issue drugs and collecting co-payments through Express Scripts' mail order pharmacy (*id.* at ¶¶ 3, 5, 11, 35, 40, 47-48) and "ensuring" the collection of co-payments from TRICARE beneficiaries who purchase the at-issue drugs at retail pharmacies in Kansas (*id.* at ¶¶ 5, 8, 11, 12, 34, 35, 40, 47-48). According to Express Scripts, these services are among the bases for the State's KCPA claims (*id.* at ¶¶ 8-11, 41, 48) and give rise to its "colorable defenses" of government-contractor immunity and preemption (id. at ¶¶ 45, 49-50).

PBMs' construct their formularies. (¶¶ 107, 156, 116, 168, 188). The PBMs' pharmacies are not merely "accommodating parties," but rather integral components of the Insulin Pricing Scheme.[9]

In addition to their dispensing activities, Express Scripts, CVS Caremark, and OptumRx were also acting as "suppliers" in their capacity as PBMs under the KCPA's broad reach. The State alleges that through their formulary construction (and corresponding Manufacturer Payments they receive) the PBMs have near complete control over the diabetic drug pricing chain. (¶¶ 6-9, 11, 287). The PBMs coordinate with the Manufacturers to set the price that every diabetic in Kansas pays for the at-issue drugs. (¶¶ 110, 159, 179, 262-65, 328). The State further alleges that PBMs' formularies set the terms of reimbursement for the at-issue drugs sold in Kansas and that these formularies were relied on by Kansas diabetics to promote diabetic health and lower prices. (¶¶ 113, 166, 187). Thus, for nearly every consumer transaction underlying the State's claims, the PBMs controlled which at-issue drugs were available, at what prices, and with what restrictions for Kansas consumers. (¶¶ 6-9, 11, 110, 159, 179, 328).

Moreover—and in contrast to the PBMs' argument that they do not "engage [with] downstream individuals" (Dkt. 85 at 5)—the PBMs work with the Manufacturers in direct outreach to Kansas diabetics, as well as physicians and pharmacies, to promote diabetes medications that are more profitable for Defendants. (¶ 328).[10] And the State further alleges that the PBMs utilize direct-to-consumer member communications, formulary change notifications, and "pull

---

[9] *Farrell v. Gen. Motors Corp.*, 815 P.2d 538, 547 (Kan. 1991) found the defendant to be an "accommodating party" because it had nothing to do with the transaction at issue. *See id.* ("the warranties that [defendant] is accused of disclaiming do not arise from the service it is providing . . . [the defendant] did not sell the van, . . . [the defendant] did not sell the [protection plan nor was] . . . [the defendant] a party to the [the protection plan]. In this case, [defendant] is acting as nothing more than an accommodating party.") The PBMs' pharmacies certainly were involved in the Insulin Pricing Scheme.

[10] *See also* n. 8, *supra*.

through"[11] efforts to convince Kansas diabetics that they are lowering the price of the at-issue drugs. (¶ 416).

Indeed, the PBMs have reaped millions of dollars per year in profits off the at-issue drugs sold to Kansas diabetics. (¶¶ 354-388). The State has certainly pled sufficient facts demonstrating that the PBMs were engaged in the consumer transactions underlying this lawsuit. The PBMs are "suppliers" under the KCPA's "extremely broad" reach. *Lynd*, 1990 U.S. Dist. LEXIS 16509, *6.

Even assuming *arguendo* that the PBMs were not "suppliers" (they are), they would still be jointly liable for the Manufacturers' misconduct. *See infra* 27-28; *see also State ex rel. Mays v. Ridenhour*, 248 Kan. 919, 930-931 (Kan. 1991) ("once a conspiracy is formed, all its members are liable for injuries caused by acts pursuant to or in furtherance of the conspiracy.").

The PBMs' counterarguments are unavailing. The PBMs start with the incorrect premise that the KCPA "applies only to transactions 'between a supplier and consumer' and its scope is 'limited to parties who actually contract with suppliers for goods and services.'" Dkt 85 at 4.[12] As stated above, the KCPA explicitly *does not* require privity nor does it require direct contact

---

[11] "Pull through" is a recognized term in the pharmaceutical industry that refers to the process of moving market share and increasing sales for a drug.

[12] The PBMs' quote language from *Wright v. Enhanced Recovery Co. LLC*, 227 F. Supp. 3d 1207, 1211 (D. Kan. 2016) (Melgren, J.). However, this language is dicta and is taken out of context. In *Wright*, this Court dismissed plaintiff's claim because the harassing phone calls at issue did not constitute "consumer transactions." *Id*. The PBM's quoted language from *Wright* ("limited to parties who actually contract with suppliers for goods and services") comes from *CIT Grp./Sales Fin., Inc. v. E-Z Pay Used Cars, Inc. Id*. at fn. 15 (citing 29 Kan. App. 2d 676, 685 (2001). However, *CIT Grp*. does not stand for the proposition that contractual privity is *generally* required under the KCPA. *CIT Grp* addresses whether plaintiffs that merely guarantee the contractual performance of a corporation are "consumers" under the KCPA. *Id*. ("The KCPA's protection is limited to individuals and sole proprietors who directly contract with suppliers for goods or services and *is not extended to individuals who promise performance of a corporation contracting with a supplier*." (emphasis added)). *CIT Grp* does not address the definition of "suppliers" and is not otherwise applicable to this case.

between suppliers and consumers.[13] *See Lynd*, 1990 U.S. Dist. LEXIS 16509, *6; *see also* K.S.A. § 50-624, cmt. (i) ("No direct contact with the consumer is required.").

From there, the PBMs build on this false premise to argue that because the PBMs do not contract with diabetics and because the parties with whom they do contract (including pharmaceutical manufacturers, health-plan payors, and pharmacies) are not "consumers," the KCPA does not apply. *Id*. at 5. This argument is a red herring. The relevant question here is whether the injured parties (Kansas diabetics) are "consumers" and whether the defendants who caused the harm (PBMs) are "suppliers." *See, e.g.*, *Holman*, 2021 U.S. Dist. LEXIS 228480, *11-12 ("under the KCPA, a plaintiff must plausibly allege that she is a consumer and the defendant is a supplier.") Thus, it is irrelevant if the other entities with whom the PBMs contract and who *are not parties to this lawsuit* are "individuals" or "family partnerships" or otherwise qualify as "consumers" under the KCPA. Dkt. 85. at 5.[14]

In sum, Kansas diabetics are "consumers" who engaged in a "consumer transactions" in purchasing the at-issue diabetes medications and the PBMs are "suppliers" in connection with these transactions. The State has satisfied the first elements of its KCPA claims.

---

[13] Even if the KCPA did require direct contact between the PBMs and Kansas diabetics (it does not), the State's allegations would satisfy that requirement. (¶¶ 328, 416).

[14] The PBMs cited authorities are inapposite. *Griffitts & Coder Custom Chopping, LLC v. CNH Indus. Am. LLC*, involved individual plaintiffs and their LLC. 438 F. Supp. 3d 1206, 1231-37 (D. Kan. 2020). The *Griffitts* Court stated that the LLC did not qualify as a "consumer," yet continued to analyze the KCPA claims from the individual plaintiff's perspectives and ultimately ruled on other grounds (the transaction at-issue was for "agricultural or business" purposes). *Id*. Likewise, in *Kastner v. Intrust Bank*, this Court's ruling was not premised on the "consumer transaction" issue, but rather based on the fact that the services in question had been purchased prior to the plaintiff's involvement. 2011 WL 2149432, at *3-4 (D. Kan. June 1, 2011) (Melgren, J.). Finally, the State's claims do not involve "goods for resale" and thus *Roberts v. Shawnee Mission Ford*, 2003 WL 22143727, at *2 (D. Kan. Aug. 20, 2003) and *Wayman v. Amoco Oil Co*., 923 F. Supp. 1322, 1364-65 (D. Kan. 1996) are not applicable here.

ii.    **The PBMs Have Engaged in Deceptive Acts under the KCPA**

K.S.A. § 50-626(a) prohibits a supplier from engaging in deceptive acts in connection with a consumer transaction. Notably, the KCPA's reach extends beyond fraud and includes deception whether or not a consumer was in fact misled. *Kelly v. VinZant,* 197 P.3d 803, 812 (Kan. 2008). As a result, proof of reliance is not required under the KCPA. *Midland Pizza, LLC v. Southwestern Bell Tel. Co.*, 2010 U.S. Dist. LEXIS 118855, *10 (D. Kan. Nov. 5, 2010). Moreover, "[w]hether a deceptive act or practice has occurred under the [KCPA] is not a question of law for the court, but rather a question of fact." *Manley v. Wichita Business College*, 701 P.2d 893, 897 (Kan. 1985).

The State has sufficiently pled the PBMs' misconduct was deceptive.

1.    **The PBMs' Misconduct Was Deceptive**

First, the State alleges that the PBMs repeatedly represent—in their SEC filings, before Congress, to the public, and directly to diabetics—that their formularies have the characteristic and benefit of lowering the price of the at-issue drugs and promoting diabetic health. (¶¶ 83, 129, 146–147, 180, 197, 208, 405-417). These representations are false—the PBMs are driving up the price by selecting higher price insulins and excluding lower-priced ones from their formularies. (¶¶ 22, 403). Moreover, the PBMs knew—or had reason to know—that their representations were false and yet still made these misrepresentations (or failed to disclose material facts) with a willful intent to deceive Kansas diabetics.[15] (¶¶ 22-26, 113, 166, 187, 309, 317-21, 345, 417-431). The PBMs' conduct has significantly increased prices and detrimentally impacted the health of diabetics. (¶¶ 434-42, Figs. 1-11). Such misconduct violates the KCPA. *See* K.S.A. § 50-626(b)(1) (making false representations as to characteristics or benefits); K.S.A § 50-626(b)(2) (willful use

---

[15] Importantly, several specific enumerated deceptive provisions do not require a plaintiff to demonstrate an intent to deceive. *See, e.g., Moore v. Bird Eng'g Co., P.A.*, 273 Kan. 2, 14 (Kan. 2002) ("[u]nder K.S.A. 50-626(b)(1), intent to deceive is not an element necessary to prove a deceptive act or practice. It is sufficient to prove that the representation was made 'knowingly or with reason to know.'")

of a misrepresentation to a material fact); K.S.A § 50-626(b)(3) (willful failure to state a material fact).

The State further alleges that the PBMs misrepresent that the Manufacturer Payments they receive reduce the price of the at-issue drugs for diabetics and payors, when in fact these Payments are driving up the price. (¶¶ 25, 146-47, 405-16). The PBMs also use the artificially-inflated list price to misrepresent the amount of savings they generate for diabetics, payors, and the healthcare system, knowing that they are directly responsible for the inflated list prices. (¶¶ 325-28). These acts also constitute deceptive practices. K.S.A § 50-626(b)(7) (making misleading representations concerning the existence or amount of price reductions); *see also Cavlovic v. J.C. Penney Corp.*, 2018 U.S. Dist. LEXIS 95565, *4 (D. Kan. June 7, 2018) ("artificially inflat[ing] prices . . . and then deceiv[ing] customers with what appeared to be steep discounts" violates the KCPA); K.S.A 50-626(b)(10) (falsely stating the reasons for offering discount prices).

Notably, three federal courts have found similar misrepresentations made by these same PBMs to be deceptive. *See Mississippi,* 2022 U.S. Dist. LEXIS 236485, at *11-12; *In re EpiPen Direct Purchaser Litig.*, 2021 WL 147166, at *19 (D. Minn. Jan. 15, 2021) (PBMs' misrepresentations that they "reduce health plans costs" and act in the "best interests" of their clients are deceptive); *In re Direct Purchaser Insulin Pricing Litig.,* 2021 WL 28862165 (D.N.J. July 9, 2021) (same). The PBMs' conduct was deceptive under the KCPA.

### 2. The PBMs' Counterarguments Are Meritless

#### a. The State Does Not Engage in Improper "Group Pleading"

First, the PBMs argue the State fails to satisfy Rule 9(b) because the complaint alleges conduct on the part of "Defendants," "PBMs", or "PBM Defendants." Dkt. 85 at 7-8. As a threshold matter, Rule 9(b) does not apply to the State's claims. *See supra* at 7-8.

Moreover, on its face the PBMs' "group pleading" argument should be dismissed out of hand; the PBMs cite to only six paragraphs, Dkt. 85 at 7 (citing ¶¶ 6, 26, 191, 375, 377, 407), while disregarding over 80 allegations that set forth the specific misconduct of each PBM. (¶¶ 82, 83 (3 allegations), 84-88, 93, 97, 101, 106-07, 109-19, 122, 124-27 (5 allegations), 129 (3 allegations), 141-47, 151, 156, 158-71, 177 (2 allegations), 179–90, 295, 314, 316, 318, 325, 328, 332, 340, 368-74, 399, 409 (11 allegations), 410 (6 allegations), 411 (5 allegations), 413-415.

The PBMs' cited authorities do not instruct otherwise. Dkt. 85 at 7-8. First, the PBMs cite *Wichita Fed. Sav. & Loan Ass'n v. Landmark Grp.*, for the proposition that Rule 9(b) (when applied to RICO claims) requires allegations that: "inform each defendant of the specific fraudulent acts justifying his inclusion in the count." 657 F. Supp. 1182, 1191 (D. Kan. 1987). However, the next sentence in *Wichita Fed. Sav* clarifies: "Rule 9(b) only requires that the complaint generally outline a fraudulent scheme and reasonably notify each of the defendants of their respective roles." The complaint certainly "generally outlines" the Insulin Pricing Scheme and notifies each Defendant of its role in the scheme.

The PBMs other authority, *Weckhorst v. Kan. State Univ.*, is equally unpersuasive. 241 F. Supp. 3d 1154 (D. Kan. 2017). *Weckhorst* involved misrepresentations about the safety of a university's fraternities, however in doing the plaintiff failed to allege any specific details beyond general references to "promotional materials" and the defendant's "website." *Id*. at 1177. The numerous specific allegations in the complaint (*see infra* 16-17) certainly go far beyond the allegations in *Weckhorst*. The State has properly pled its KCPA claims against each Defendant.

### b.    The PBMs' Misrepresentations Are Actionable

### i.    The PBMs' Misrepresentations Are More Than Puffery or Aspirational Statements

Next, the PBMs argue that none of the alleged misrepresentations are actionable. Dkt. 85 at 9-14. As an initial matter, the PBMs' argument misconstrues the State's claims. The State's claims are not based solely on the PBMs' misrepresentations. Rather, the entire Insulin Pricing Scheme—from obfuscating Manufacturer Payments (¶¶ 354–376), to excluding lower-priced insulins and favoring higher priced ones on formularies (¶¶ 22, 321), to increasing availability of higher-priced drugs (¶ 328), to engaging in "non-medical formulary switching" to generate additional profits (¶¶ 439–440)—is deceptive and unconscionable.

Nonetheless, the PBM misrepresentations alleged in the complaint certainly amount to more than generalized "expressions of opinion" or mere "puffery." Dkt. 85 at 9-14. In total, the complaint provides nearly 40 examples of PBM misrepresentations. For illustrative purposes, here are a few of these allegations:

- CVS Caremark represents that it "design[s] pharmacy benefit plans that minimize the costs to the client while prioritizing the welfare and safety of the clients' members and helping improve health outcomes." (¶ 83)[16]

- Express Scripts represents that it "manage[s] the cost of the drug benefit . . . assists in controlling costs; evaluat[es] drugs for efficacy, value and price to assist clients in selecting a cost-effective formulary." (¶ 129)

---

[16] Notably, the PBMs' cited authority, *In re. Int'l Harvester* Co, 104 F.T.C. 949 (1984) holds that all express claims are presumed to be material and that even "implied claims are material if they pertain to the central characteristics of the product, such as its safety, cost, or fitness for the purpose sold." *Id*. Thus, under the PBMs' own authority, these allegations are presumed to be material.

- In January 2016, Express Scripts president Tim Wentworth stated that "[Express Scripts] saved our clients more than $3 billion through Express Scripts National Preferred Formulary." (¶ 325)

- In April 2019, CVS Caremark President Derica Rice stated that "over the last three years . . . CVS Caremark has helped our clients save more than $141 billion by blunting drug price inflation, prioritizing the use of effective, lower-cost drugs and reducing the member's out-of-pocket spend." (¶ 325)

- In April 2019, the President of Express scripts represented that Express Scripts "negotiate[s] lower drug prices with drug companies on behalf of our clients, generating savings that are returned to patients in the form of lower premiums and reduced out of pocket costs." (¶ 410).

- On May 11, 2010, CVS Caremark stated (related to diabetes) to: "help us add value for our PBM clients to improve the health of plan members . . . a PBM client with 50,000 employees whose population has an average prevalence of diabetes could save approximately $3.3 million a year in medical expenditures." (¶ 409)

- In February 2017, the head of CVS Caremark stated that "Any suggestion that PBMs are causing [drug] price[s] to rise is simply erroneous." (¶ 411).

- OptumRx's website has stated "[t]he services we provide help improve health outcomes for patients while making prescription drugs more affordable for plan sponsors and individuals, and more sustainable for the country . . . the reason is simple: drug manufacturers are responsible for the high cost of prescription drugs . . . OptumRx negotiates better prices with drug manufacturers for our customers and

consumers . . . At OptumRx, our mission is helping people live healthier lives and to help make the health system work better for everyone." (¶ 410).

- On August 31, 2016, Express Scripts Senior Vice President and Chief Innovation Officer Glen Stettin released a statement that included the following: "[d]iabetes is wreaking havoc on patients, and it is also a runaway driver of costs for payors . . . [Express Scripts] helps our clients and diabetes patients prevail over cost and care challenges created by this terrible disease." (¶ 409)

- On August 31, 2016, Express Scripts Senior Vice President and Chief Innovation Officer Glen Stettin released a statement that Express Scripts broadens insulin options for patients and bends down the cost curve of what is currently the costliest class of traditional prescription drugs. (¶ 409).

- In January 2017, Tim Wentworth, CEO of Express Scripts, represented that "without PBMs, and specifically without Express Scripts, our clients would pay [many times] more for [insulin]." (¶ 409).

These misrepresentations (as well as the others in the complaint) bear no resemblance to the jingle slogans and vague opinion statements found to be "puffery" in the PBMs' cited authority. Dkt. 85 at 8-12 (citing *Bologna v. Allstate Ins. Co.*, 138 F. Supp. 2d 310, 323 (E.D.N.Y. 2001) ("You're in good hands with Allstate"); *Moody v. Ocwen Loan Servicing, LLC*, 2016 WL 8814352, at *4 (C.D. Cal. Feb. 22, 2016) ("Helping Homeowners Is What We Do!"); *Alpine Bank v. Hubbell*, 555 F.3d 1097, 1106–07, 1112–13 (10th Cir. 2009) ("You take care of your dream. We'll take care of everything else."); *Bimbo Bakeries USA, Inc. v. Sycamore*, 29 F.4th 630, 645 (10th Cir. 2022) (slogan that a bakery is "local" to the consumer's area); *Friedman v. Nationwide Ins. Co. of Am.*, 2017 U.S. Dist. LEXIS 236227, at *6 (C.D. Cal. Feb. 9, 2017) ("Nationwide is on your side");

*Mulder v. Kohl's Dep't Stores, Inc.*, 865 F.3d 17, 22 n.5 (1st Cir. 2017) ("Amazing prices");

*Ormsby v. Imhoff & Assocs., P.C.*, 2014 WL 4248264, at *10 (D. Kan. Aug. 27, 2014) (referring

to attorneys as "po-dunk," and the client as "lucky"); *Freedom Transp., Inc. v. Navistar Int'l Corp.*,

2020 WL 430213, at *9 (D. Kan. Jan. 28, 2020) ("worthwhile purchase" and "these should be

good trucks for you guys"); *Baldwin v. Priem's Pride Motel, Inc.*, 580 P.2d 1326, 1329 (Kan.

1978) ("first class condition"); *Cook, Perkiss & Liehe, Inc. v. N. Cal. Collection Serv. Inc.*, 911

F.2d 242, 246 (9th Cir. 1990) ("We're the low cost commercial collection experts.").[17]

Rather, the PBMs representations that they lower the price of insulin (with certain

allegations including the exact dollar amounts) and promote diabetic health are statements of facts

that are capable of objective verification. *See Wasatch Transp., Inc. v. Forest River, Inc.*, 53 F.4th

577, 585-86 (10th Cir. 2022) (finding statements that involved verifiable facts are not puffery).

Indeed, the federal courts in *Mississippi, In re EpiPen Direct Purchaser Litig.*, and *In re Direct

Purchaser Insulin Pricing Litig.*, each rejected near identical "puffery" arguments asserted by

---

[17] The PBMs cite to a litany of securities fraud cases (mostly from other jurisdictions) that require more stringent requirements than the KCPA, such as scienter and reliance, and are otherwise not analogous to the PBMs' misstatements of fact alleged here. *See Rosenzweig v. Azurix Corp.,* 332 F.3d 854, 869 (5th Cir. 2003) (prospectus statements about "competitive strengths, experienced management, and future prospects" not actionable); *Emps.' Ret. Sys. Of Haw. v. Whole Foods Mkt., Inc.,* 905 F.3d 892, 901 (5th Cir. 2018) (generalized statements about quality were insufficient)*; Kiger ex rel. Qualcomm Inc. v. Mollenkopf*, 2021 WL 5299581, at *3 (D. Del. Nov. 15, 2021) (aspirational statements about "including women and racially/ethnically diverse candidates in the [nominee] pool" found to be not actionable); *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997) (generalized statements that a merger was going well were insufficient given they were made in conjunction with a registration statement that contained many explicit risk factors and warnings); *Ind. Pub. Ret. Sys. v. Pluralsight, Inc*., 45 F.4th 1236, 1249 (10th Cir. 2022) (statements such as "starting to see the efficiencies," "beginning to see the benefits of synergies," and "built out some of the infrastructure around sales to scale" found to be not actionable); *Schiro v. Cemex, S.A.B. de C.V*., 396 F. Supp. 3d 283, 298 (S.D.N.Y. 2019) (statements that company "reject[s] all forms of corruption," is "committed to conducting [its] business with transparency and integrity," and "tr[ies] to ensure that all transactions comply with anti-bribery laws" found to be not actionable). Finally, the PBMs cite to a RICO mail fraud case. Dkt. 85 at 11 (citing *Forsyth v. Humana Inc*., 114 F.3d 1467, 1481 (9th Cir. 1977)). Unlike in *Forsyth*, the State's allegations recited above do not involve "highly subjective" or "aspirational statements." *Forsyth*, 114 F.3d at 1481 (finding defendant's commercial touting that it could "control costs" was too general to rely on as a method to calculate insurance premiums).

these same PBMs. 2022 U.S. Dist. LEXIS 236485, at *11-12; 2021 WL 147166, at *19; 2021 WL 28862165. Respectfully, the Court should do the same here.

### c.    *Noerr-Pennington* **Does Not Apply**

First, the PBMs' *Noerr Pennington* argument consists of only one conclusory sentence which cites to no authority showing this doctrine applies to the KCPA. Thus, respectfully the Court should not consider this argument. *See Adler v. Wal-Mart Stores, Inc*., 144 F.3d 664, 679 (10th Cir. 1998) ("Arguments inadequately briefed in the opening brief are waived.")

Even if considered, this argument is inappropriate at the pleading stage. The PBMs have yet to establish the predicate for invoking *Noerr-Pennington*, and the State has had no opportunity to conduct discovery of such a predicate, if any. *See Waugh Chapel S., LLC v. United Food & Com. Workers Union Loc. 27*, 728 F.3d 354, 359–60 (4th Cir. 2013) ("*Noerr-Pennington* is an affirmative defense," and a motion to dismiss "cannot reach the merits of an affirmative defense [unless] all facts necessary to the affirmative defense clearly appear on the . . . complaint.") Accordingly, courts have routinely declined to address *Noerr-Pennington* on a motion to dismiss. *Navient Sols. LLC v. Law Offices of Jeffrey Lohman,* 2020 WL 1867939, at *4 (E.D. Va. Apr. 14, 2020); *In re Apple Inc. Sec. Litig.,* 2020 WL 2857397, at *18 (N.D. Cal. June 2, 2020).

In addition, the PBMs' argument that the State has failed to allege that the PBMs' congressional testimony is false ignores dozens of allegations setting forth the falsity of the PBMs' statements that: (1) they lower the price of the at-issue drugs (¶¶ 311-29, 343-45, 352-53; 418-20, Figs. 1-11 (demonstrating price increases caused by PBM conduct)); (2) they promote diabetic health (¶¶ 434-42 (demonstrating PBMs' conduct harms diabetics)); and (3) they are transparent (¶¶ 356-76, 423-33 (demonstrating PBMs are not transparent with diabetics and payors)).

Even assuming, *arguendo*, that the *Noerr-Pennington* argument is ripe and applies to the KCPA, the State has nonetheless sufficiently pled its KCPA claims based on allegations that do not arise from congressional testimony.

> ### d. Defendants' Publishing and Utilizing False List Prices is Actionable under the KCPA

Next, the PBMs argue that Defendants' conduct in publishing and utilizing the false list prices generated by the Insulin Pricing is not actionable. Dkt. 85 at 14 (citing 42 U.S.C. § 1395w-3a(c)(6)(B)). For the reasons stated in the State's Manufacturer Response, 42 U.S.C. § 1395w-3a(c)(6)(B) is not relevant to the State's claims and the Defendants' conduct related to these false prices violates the KCPA. *See* Manufacturer Resp. at 24-27.

> ### e. The PBMs Have a Duty to Disclose

As the PBMs concede, the KCPA only requires demonstrating a "duty to disclose" with respect to claims based on omissions. Dkt. 85 at 14. Here, in addition to violations under K.S.A § 50-626(b)(3) (failing to state a material fact), the State has alleged that PBMs engaged in numerous other KCPA violations that do not require demonstrating duty. (¶¶ 461 alleging KCPA violations under K.S.A § 50-626(b)(1), (2), (7), and (10)). Thus, the State has sufficiently pled its KCPA claims, regardless if the PBMs had a duty to disclose or not.

Nevertheless, the State has sufficiently pled that the PBMs had a duty to Kansas diabetics. Under the KCPA, a supplier has a duty to disclose if the supplier knows that the consumer is entering into a transaction under a mistake about a material fact and the consumer would reasonably expect disclosure of such fact. *See Nieberding v. Barrette Outdoor Living, Inc.*, 302 F.R.D. 600, 613 (D. Kan. 2014). Given that the PBMs represent that their entire purpose in the

pharmaceutical market is to lower prices and promote health, they are under a duty to disclose that they are, in fact, doing the exact opposite.[18]

### iii. The PBMs' Misconduct Is Also Unconscionable under the KCPA

In addition to being deceptive under the KCPA, the PBMs' conduct is also unconscionable. The KCPA prohibits any supplier from "engag[ing] in any unconscionable act or practice in connection with a consumer transaction . . . whether it occurs before, during or after the transaction." K.S.A. § 50-627. Under the KCPA, "[a]n unconscionable act or practice requires both supplier deception and unequal bargaining power." *Via Christi Reg'l Med. Ctr., Inc. v. Reed*, 298 Kan. 503, 525 (2013). The State has properly pled both of these elements.[19]

### 1. The PBMs' Misconduct Is Unconscionable

The State alleges that the PBMs violated the specifically enumerated unconscionable acts proscribed in the KCPA. In particular, Kansas diabetics cannot reasonably protect their interests because of the Defendants dominant market position and because—as a result of their diabetes— they need the at-issue drugs to stay alive. (¶¶ 4-6, 219, 286-87). Thus, Kansas diabetics have no choice but to pay the inflated prices generated by the Insulin Pricing Scheme. Such misconduct is unconscionable. K.S.A § 50-627(b)(1) (taking "advantage of the inability of the consumer reasonably to protect the consumer's interests because of the consumer's physical infirmit[ies]" violates the KCPA); K.S.A § 50-627(b)(5) (inducing consumers to entering into an excessively

---

[18] The State does not argue that the PBMs must disclose specific proprietary pricing policies to diabetics. Thus, *Langford v. Rite Aid of Ala., Inc.*, 231 F.3d 1308, 1312-14 (11th Cir. 2000); *Bonilla v. Volvo Car Corp.*, 150 F.3d 62, 70-71 (1st Cir. 1998); *Katzman v. Victoria's Secret Catalogue*, 167 F.R.D. 649, 656 (S.D.N.Y. 1996), aff'd, 113 F.3d 1229 (2d Cir. 1997); *Sullivan v. Lab. Corp. of Am. Holdings*, 2018 WL 1586471, at *4-5, *8-9 (M.D.N.C. Mar. 28, 2018) are not relevant here. Moreover, both *Williamson v. Amrani*, 152 P.3d 60, 73 (Kan. 2007) and *Marksberry v. FCA US LLC*, 606 F. Supp. 3d 1075, 1083 (D. Kan. June 9, 2022) (Melgren, J.) were decided on summary judgement based on lack of evidence produced. The State is not required to produce evidence demonstrating at the pleading stage.

[19] The State's allegations that the PBMs' conduct was deceptive (as detailed above) are sufficient to satisfy the deceptive prong of the unconscionability analysis.

one-side transactions violates KCPA). The only argument the PBMs put forth as to whether or not they have taken advantage of Kansas diabetics inability to protect their interests (K.S.A § 50-627(b)(1)) is that the State fails to allege "any facts establishing unequal bargaining power." Dkt. 85 at 17. The PBMs are incorrect, the State has sufficiently alleged unequal bargaining power. *See infra* at 24-25. The State has properly pled unconscionability under K.S.A § 50-627(b)(1).

Further, the PBMs knew that the price paid by Kansas diabetics grossly exceeded the price at which the at-issue drugs were sold in markets not tainted by the Insulin Pricing Scheme and yet mandated the inclusion of: (1) the inflated prices in their payor and pharmacy contracts which then set the prices paid by diabetics and (2) the most expensive at-issue drugs on their formularies which further drove up the price. (¶¶ 324, 418-20); K.S.A § 50-627(b)(2) (knowing that "the price grossly exceeded the price at which similar property or services were readily obtainable in similar transactions by similar consumers" violates KCPA); K.S.A § 50-627(b)(6) (making "misleading statement of opinion on which the consumer was likely to rely" violates the KCPA).

The PBMs argue that the State's unconscionability claim under K.S.A § 50-627(b)(2) fails because the State's alleged comparable markets (Europe, Canada, and certain federal programs) are not "similar markets" with "similar consumers." Dkt 85 at 17-18. This argument is meritless. Because the PBMs' Insulin Pricing Scheme has polluted all "PBM-negotiated" markets, to find a comparable market unaffected by their scheme requires going outside the PBM dominated system, including to other countries. Moreover, the State alleges with specificity that federal health plans that negotiate directly with the Manufacturers (which would include on behalf Kansas diabetics who are part of these programs)[20] paid $16.7 billion less for the at-issue drugs from 2011 through

---

[20] Express Scripts' Notice of Removal confirms that it "provide[s] services to members of the DoD's TRICARE health care program . . . in Kansas." Notice of Removal, Dkt. 1 at ¶ 1;

2017 than federal programs that relied on PBMs. (¶ 420). Thus, the State has alleged specific instances where the price generated by the PBMs' Insulin Pricing Scheme "grossly exceeded the price" paid in similar transactions.[21] Nothing more is required at the pleading stage. *Via Christi Reg'l Med,* 298 Kan. at 524-28.

## 2.    The PBMs have Unequal Bargaining Power

As alleged, the Manufacturers make nearly every vial of insulin available in Kansas and the PBMs have near complete control of the insulin pricing system. (¶¶ 219, 286-87) Further, diabetics need these drugs to stay alive. (¶¶ 4, 240, 430, 441). Indeed, given this market dominance and the fact that their lives literally depend on access to these drugs, diabetics have little alternative except to submit to the Insulin Pricing Scheme. (¶ 430). The State's allegations satisfy the second unconscionable element because the PBMs have unequal bargaining power.

The PBMs argue that the State has failed to allege "unequal bargaining power because the PBM Defendants do not bargain or contract with Kansas diabetics at all—they negotiate with manufacturers, health-plan payors, and pharmacies." Dkt. 85 at 16.[22] The PBMs again, however, misconstrue the KCPA—the State is not required to demonstrate that diabetics interacted directly with the PBMs. *See Lynd*, 1990 U.S. Dist. LEXIS 16509, *6. Rather, the "key concern with unconscionability is an imbalance of power and an abuse of that imbalance." *Tomlinson v. Ocwen Loan Servicing, LLC*, 2015 U.S. Dist. LEXIS 162193, *12 (D. Kan. Dec. 3, 2015) (Melgren, J).

---

[21] The cases that the PBM cite for support are not analogous to this case. *Shigo v. Clark* was decided on summary judgment where the plaintiff presented "no evidence" of lower prices from comparable markets. 2022 WL 2966320, at *6 (D. Kan. July 27, 2022). In *Geico Indem. Ins. Co. v. Kannaday*, 2007 WL 2990552, at *2 (D. Kan. Oct. 11, 2007), the court dismissed the KCPA claim because there were no "facts which would support a conclusion that [defendant's] actions . . . were in any way deceptive, oppressive, or overreaching," nor did the plaintiff do anything "at all in her brief to challenge the general facts set forth in [defendant's] motion" demonstrating the plaintiff's unconscionability claim failed. As explained above, the State alleged that the PBMs' conduct was deceptive and unconscionable. *See supra* at 14-20.

[22] The PBM's reliance on *SMD Invs. Ltd. v. Raytheon Aircraft Co.*, is misplaced; in *SMD Invs.* the plaintiff conceded there was no unequal bargaining power. 2006 WL 580968, at *8 (D. Kan. Mar. 8, 2006).

And the State has alleged that the PBMs abused their dominant market power by—in contravention to their representations—driving up the price of the at-issue drugs and harming the health and wellbeing of diabetics. Such conduct is unconscionable.[23]

### B.    The State Has Properly Pled Unjust Enrichment

To state a claim for unjust enrichment requires: (1) a benefit conferred upon the defendants; (2) defendants' appreciation or knowledge of the benefit; and (3) defendants' retention of the benefit under circumstances which make it inequitable. *J.W. Thompson Co. v. Welles Prods. Corp.,* 758 P.2d 738, 744 (Kan. 1988). The State has alleged facts establishing these elements. The State alleges that all Defendants, including the PBMs, generated enormous profits from the at-issue drugs purchased by Kansas diabetics at the inflated prices generated by the Insulin Pricing Scheme. (¶¶ 19, 352-38). It would be inequitable for the PBMs to retain these profits given that they were generated by their unfair and deceptive scheme that has caused so much harm.

Rather than addressing these allegations directly, PBMs instead argue that the State may not pursue an unjust enrichment claim: (1) because it is foreclosed by contract and (2) it is disallowed from doing so in its *parens patriae* capacity. Dkt. 85. at 18-21. Neither one of these arguments have merit.

*First*, the State is not bringing unjust enrichment claims in its capacity as a payor. Dkt. 85 at 18-19. Thus, the PBMs' contract-based arguments are not applicable. Moreover, the PBMs do not argue—nor could they—that any contracts exist between the PBMs and diabetics related to the State's claims.

---

[23] The State is not alleging that the "PBM Defendants used their market power to fix insulin prices." Dkt. 85 at 16. Thus, *In re Graphic Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1030 (N.D. Cal. 2007); *In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 584 (M.D. Pa. 2009); and *Schoenbaum v. E.I. Dupont De Nemours & Co.*, 517 F. Supp. 2d 1125, 1153 are not applicable here.

*Second*, courts in the 10th Circuit have routinely recognized that states can bring claims related to the statutes they are charged with enforcing. *Satsky v. Paramount Commc'ns, Inc.*, 7 F.3d 1464, 1467-68 (10th Cir. 1993). The KCPA specifically provides for enforcement by the Attorney General. K.S.A. § 50-632 (a). In bringing KCPA enforcement actions, the Court is allowed to "grant other appropriate relief." *Id.* § 50-632 (c)(8). Thus, the KCPA clearly creates a right for the State to bring *parens patriae* claims associated with violations of the KCPA—and disallowing related claims such as unjust enrichment based on the same conduct would create a patchwork of litigation that would frustrate the State's ability to enforce this statute.[24]

Further, the PBMs' contention that courts "routinely hold that States do not have *parens patriae* standing for unjust-enrichment claims" also lacks merit. Dkt. 85 at 21. In support, PBMs cite three cases. None of these cases support the PBMs' argument. The decision in *Gov't of Puerto Rico v. Carpenter Co.*, 442 F. Supp. 3d 464, 478–79 (D.P.R. 2020), arose in an antitrust case and the court's decision relied on Puerto Rico law and pleading elements that are not present here. *Id.* at 476–77. *In re Packaged Seafood Prods. Antitrust Litig.*, 338 F. Supp. 3d 1079, 1098–1104 (S.D. Cal. 2018), did not involve the question PBMs cite it for—rather, in that case the court addressed equitable standing generally and simply dismissed the unjust enrichment count because it found that the plaintiff had not alleged sufficient impacts on a "significant portion of its population," which was a threshold standing requirements separate and apart from the elements of unjust enrichment. *Id.* at 1096, 1101 Notably, the court dismissed the count without prejudice. *Id.* at

---

[24] Two of the cases cited by the PBMs, *Satsky*, 7 F.3d at 1469, and *Sierra Club v. Two Elk Generation Partners, Ltd. P'ship*, 646 F.3d 1258, 1268 (10th Cir. 2011), actually found that statutory enforcement powers conferred by statute created standing by the state to sue. Similarly, *All Brands Distrib., LLC v. Vital Pharms., Inc.* found that the Defendant was unjustly enriched, despite benefits being conferred to others not party to the litigation. 2022 WL 3646274, at *2 (D. Kan. Aug. 24, 2022) (Melgren, C.J.). The final case cited by the PBMs, *State ex rel. Sullivan v. Lujan*, did not deal with a statute that contemplated enforcement powers by the State because the statute actually delegated enforcement powers to the federal government. *Sullivan*, 969 F.2d 877, 883 (10th Cir. 1992).

1104–05. The third case, *In re Auto. Parts Antitrust Litig.*, No. 13-cv-2005, 2021 U.S. Dist. LEXIS 8201, at *4–9 (E.D. Mich. Jan. 15, 2021), did not question whether an unjust enrichment claim was appropriate in *parens patriae* cases, it merely held that the plaintiff could not use an unjust enrichment claim to end run a failure to establish required elements for an antitrust claim.

### C.     The Complaint States a Claim for Civil Conspiracy

As explained fully in the Manufacturer Response, relied on and incorporated herein, the State's Complaint alleges that the Manufacturers and PBMs coordinated their efforts and "agreed to and participated in" the Insulin Pricing Scheme" and plausibly asserts a claim for civil conspiracy against the Defendants. (¶¶ 110, 127, 159, 177, 179, 328, 482-87). The facts in support thereof, alleged by the State, describe a course of conduct which plausibly suggests, if not establishes, the existence of a conspiratorial agreement. *See* Manufacturer Resp. at 29-33. Additionally, since the Complaint adequately stated claims for KCPA and unjust enrichment, the State has properly anchored its civil conspiracy claims on those underlying wrongs.

The PBMs cited authority, *Buridi v. Idbeis*, 2016 U.S. Dist. LEXIS 162466 (D. Kan. Nov. 22, 2016), is unpersuasive. There, the Court simply stated that the plaintiff did not assert "any unlawful agreement or unlawful means to obtain this goal" without much analysis. *Id.* at *23. As detailed in the Manufacturer Response, the State has provided detailed allegations demonstrating the coordinated efforts between the PBMs and Manufacturers. *See* Manufacturer Resp. at 29-33.

Finally, even if this Court finds that the State has failed to plausibly plead a conspiracy, such a finding will not resolve the State's claims against the Defendants for their individual violations of the KCPA and for unjust enrichment.

### D.     None of the State's Claims Are Time-Barred

The PBMs do not argue—nor could they—that the State's claims on behalf of diabetics are time-barred. Dkt. 85 at 21 (arguing only that the "State in its capacity as a health plan operator or

payor are time barred."); *see State ex rel. Stephan*, 8 Kan. App. 2d at 61-63 (holding that KCPA limitations period does not apply to the State). And the State is not asserting claims in its capacity as a health plan. None of the State's claims are time-barred.

### E. The State Sufficiently Pleads its Claims Against the Parent Companies[25]

The State has alleged claims against each PBM parent company based on their own conduct, not merely the conduct of their subsidiaries. As set forth fully in the State's responses to the jurisdictional motions filed by these parent entities, the State is not alleging liability against these entities simply due to their size or corporate structure.[26] Rather, the State's claims against these parents are based on the extensive information the State already possesses—even before discovery—that each of these companies was directly involved in the Insulin Pricing Scheme.

Even the PBMs' own authority acknowledges that parent companies directly involved in alleged wrongdoings may not escape the consequences of their actions through corporate gamesmanship. *See United States v. Bestfoods*, 524 U.S. 51, 64-66 (1998) (stating, "the fact that a corporate subsidiary happens to own [the entity that caused the harm] . . . does nothing, then, to displace the rule that the parent is itself responsible for the wrongs committed by its agents.")

As explained in the State's jurisdictional responses, the complaint sets forth uncontroverted allegations that Evernorth and CVS Health mandated an overall business strategy and carried out that strategy in furtherance of the Insulin Pricing Scheme. Each of these parents was directly involved in the formulary construction, strategic formulary initiatives, and Manufacturer Payment negotiations that gave rise to the Insulin Pricing Scheme, including in Kansas. (¶¶ 82-88, 107 (CVS

---

[25] "Parents" means Evernorth Health, Inc., CVS Health Corporation, and CVS Pharmacy, Inc.

[26] *See* Plaintiff's Response to CVS Caremark Defendant's Rule 12(b)(2) Motion to Dismiss and Plaintiff's Response to Evernorth Health, Inc.'s Motion to Dismiss for Lack of Personal Jurisdiction, incorporated herein.

Health); 124-29, 156 (Evernorth). Further, these parents, including their CEOs and top executives, carried out the Insulin Pricing Scheme by directly engaging in meetings with the Manufacturers. *Id*. The conduct of these parents had the intended and foreseeable effect of harming Kansas diabetics and the State. These allegations, taken as true, sufficiently allege that the parents were engaged in the conduct that gave rise to the Insulin Pricing Scheme.

The PBMs attempt to distract from these allegations by focusing on whether: (1) the State's allegations satisfy an alter-ego/agency theory and (2) CVS Pharmacy is liable. Dkt. 85 at 24-26. First, the State is not relying on an alter ego/agency theory, but rather the parent's direct conduct. In addition, notably the PBMs do not put forth specific arguments with respect to any parents beyond CVS Pharmacy. However, even with respect to CVS Pharmacy, the PBMs' argument is unconvincing. CVS Pharmacy has dispensed millions of vials of insulin in Kansas and profited from the artificially-inflated price on each of these prescriptions. (¶¶ 90-93, 107, 117). CVS Pharmacy was the direct point of contact between Kansas diabetics and the CVS family with respect to each at-issue drug dispensed pursuant to the Insulin Pricing Scheme. Indeed, CVS Pharmacy was an integral part of the Insulin Pricing Scheme.

The holding in *Mississippi*, 2022 U.S. Dist. LEXIS 236485, at *15-19 does not support dismissing the parents or CVS Pharmacy. In *Mississippi*, the court analyzed liability based on theories of agency and alter ego and found that the plaintiff had failed to allege sufficient facts demonstrating that the parent controlled its subsidiaries. 2022 U.S. Dist. LEXIS 236485, at *18. As discussed above, the State here does not have to rely on such theories because the complaint alleges that the parents were directly involved in the Insulin Pricing Scheme.

The *Mississippi* holding is distinguishable with respect to CVS Pharmacy as well. The Mississippi Court dismissed CVS Pharmacy because "[t]he State merely alleges that CVS

Pharmacy 'provided retail pharmacy services in Mississippi' and it is therefore somehow connected to the alleged Insulin Pricing Scheme." The complaint here goes beyond a merely alleging that CVS Pharmacy was a retail pharmacy in Kansas and includes numerous allegations demonstrating CVS Pharmacy's involvement in the Insulin Pricing Scheme.

## V. CONCLUSION

For the foregoing reasons, the PBM Defendants' Motion to Dismiss should be denied. If the Court is inclined to dismiss any claims, the State respectfully requests the opportunity to amend the complaint. *See* FED. R. CIV. P. 15(a)(2).

RESPECTFULLY SUBMITTED this the 24th day of April, 2023.

KRIS KOBACH, ATTORNEY GENERAL
STATE OF KANSAS

*/s/ R. Johan Conrod*
R. Johan Conrod KS Bar # 29563
Joanne Cicala (pro hac vice)
Josh Wackerly (pro hac vice)
THE CICALA LAW FIRM PLLC
Dripping Springs, TX 78620
Tel: (512) 275-6550
joanne@cicalapllc.com
josh@cicalapllc.com
johan@cicalapllc.com

Christopher Teters, KS Bar # 17781
OFFICE OF THE KANSAS ATTORNEY GENERAL
120 SW 10th Avenue
Topeka, KS 66612-1597
Tel: (785) 296-3751
Fax: (785) 291-3699
chris.teters@ag.ks.gov

Of Counsel:

W. Lawrence Deas *(pro hac vice)*
William Liston, III *(pro hac vice)*
LISTON & DEAS, LLC
605 Crescent Boulevard, Suite 200
Ridgeland, MS 39157

Tel: (601) 981-1636
Fax: (601) 982-0371
lawrence@listondeas.com
william@listondeas.com

Edwin S. Gault, Jr. *(pro hac vice)*
Walter G. Watkins, III. *(pro hac vice)*
Tanya D. Ellis *(pro hac vice)*
FORMAN WATKINS & KRUTZ
210 East Capitol Street, Suite 2200
Jackson, MS 39201-2375
Tel: (601) 960-8600
Fax: (601) 960-8613
Win.Gault@formanwatkins.com
Tanya.Ellis@formanwatkins.com
Trey.Watkins@formanwatkins.com

Matthew C. McDonald *(pro hac vice)*
DAVID NUTT & ASSOCIATES
605 Crescent Blvd, Suite 200
Ridgeland, MS 39157
Tel: (601) 898-7302
mattm@davidnutt.com

## CERTIFICATE OF SERVICE

I hereby certify that on April 24, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to all counsel of record.

*/s/ R. Johan Conrod*
R. Johan Conrod